UNITED STATES *v.* JOHNSON.

·ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
        THE WESTERN DISTRICT OF MISSOURI.

    No. 433. : Argued April 13, 1911.—Decided May 29, 1911.

The term "misbranded" and the phrase defining what amounts to
    misbranding in § 8 of the Food and Drugs Act of June 30, 1906,
    ·34 Stat. 768, c. 3915, are aimed at false statements as to identity of
    the article, possibly including strength, quality and purity, dealt
    with in § 7 of the act, and not at statements as to curative effect;
    and so *held* that a statement on the labels of bottles of medicine
    that the contents are effective as a cure for cancer, even if mislead-
    ing, is not covered by the statute.
177 Fed. Rep. 313, affirmed.

    THE facts are stated in the opinion.·

*The Solicitor General,* with whom *Mr. Assistant Attorney General Denison, Mr. George P. McCabe* and *Mr. Loring C. Christie,* Special Assistants to the Attorney General, were on the brief, for the United States:

The acts charged in the indictment fall within the letter of the statute, and the matters charged are not to be carved out of the statute as being not within its purposes. They are both injurious to health and frauds on the public.

Even if the public health had been the sole concern of the statute the matters charged in the indictment would have fallen within its intendment.

Cheats and frauds were, however, among the principal mischiefs denounced by the act. See committee reports, congressional debates, and the other acts *in pari materia.*

Reference is made to debates in order to show what the evil was which the legislature intended to remedy. *Jennison* v. *Kirk,* 98 U. S. 459; *Holy Trinity Church* v. *United States,* 143 U. S. 465; *American Net. &c. Co.* v. *Worthington,* 141 U. S. 473; *Binns* v. *United States,* 194 U. S. 486, 495, 496; *Blake* v. *National Banks,* 23 Wall. 307, 319; and see 59 Cong., 1st sess., H. Rept. No. 2118, to accompany S. 88; 58 Cong., 2d sess., Sen. Rept. No. 1209, to accompany H. R. 6295; Sen. Bill, 198, 58th Cong., 2d sess.; 57 Cong., 1st sess., S. Rept. No. 972, to accompany S. 3342.

Other statutes *in pari materia* indicate the same policy to deal not only with health but with frauds. See Act of July 1, 1902, 32 Stat. 632; Rev. Stat., § 2934; Act of March 3, 1905, 33 Stat. 87.

The legislative history of the enactment affirmatively shows that this very evil was considered and discussed and intended to be covered.

As soon as it was proposed to extend the definition of the word "drug" so as to include patent medicines, opposition arose on this very ground, that misrepresentations of curative properties would be covered. The discussion affirmatively showed that this was intended, and the

opposition failed. House bill No. 6295, § 5, 58th Cong., 2d sess., p. 34; bill No. 3342, 57th Cong., 1st sess; Sen. Rep. No. 972, 58th Cong., 2d sess., Sen. Rep. No. 1209, pp. 4–68; 58th Cong., 2d sess.; Id. pp. 97–100.

The amendment to the bill changing the definition of misbranding so as to cover not merely "any statement regarding the ingredients or substances contained in the article," but statements regarding the article itself, was made as a result of doubt whether this sort of thing would otherwise be covered. A substitute bill which was urged as preferable because it excluded misstatements of curative properties was rejected.

The practice of patent-medicine concerns to make extravagant "cure-all claims" was one of the principal evils denounced in the public agitation contemporaneous with the progress of the bill. The facts of this agitation being part of the history of the times can be examined as indicating the nature of the evils attacked. *United States* v. *Pac. R. R. Co.*, 91 U. S. 72, 79; *Church of the Holy Trinity* v. *United States, supra*, p. 464; *Smith* v. *Townsend*, 148 U. S. 490; *Aldridge* v. *Williams*, 3 How. 1, 24; *United States* v. *Freight Assn.*, 166 U. S. 290; *McKee* v. *United States*, 164 U. S. 287, 292; *Mobile R. R.* v. *Tennessee*, 153 U. S. 486, 502; *Preston* v. *Browden*, 1 Wheat. 115, 121; *Ex parte Milligan*, 4 Wall. 2, 114; *Hamilton* v. *Rathbone*, 175 U. S. 419; *Pac. Coast S. S. Co.* v. *United States*, 33 Ct. Cl. 36, 56.

From the first enforcement of the act the officers charged by it with the duty to put it in operation have construed and applied it to include fraudulent labels of the character here involved, and this construction was uniformly acquiesced in except that the present defendant has contested it. *United States* v. *Moore*, 95 U. S. 760, 763; *Heath* v. *Wallace*, 138 U. S. 573, 582; *Hastings Co.* v. *Whitney*, 132 U. S. 357, 366; *Five Per Cent Cases*, 110 U. S. 471; *Edwards* v. *Darby*, 12 Wheat. 206; *Brown* v. *United States*,

113 U. S. 568; *Union Insurance Co.* v. *Hoge*, 21 How. 35; *Smyth* v. *Fiske*, 23 Wall. 374.

See also Notices of Judgment, published by the Department of Agriculture, Nos. 16, 25, 29, 54; see also *United States* v. *Munyon's Remedy Co.*, U. S. Dist. Ct., E. D. Pennsylvania, Dec. 14, 1910:

The similar provisions of various state statutes have been construed by the administrative officers as covering false statements as to curative properties.

Practically the general definition of misbranding would have no application to the second class of drugs unless it applies to the sort of thing here involved.

The cure-all evil is the one great misbranding evil of the patent-medicine trade. In using the unlimited language which it did use Congress cannot have intended not to exclude this evil, thereby practically leaving the misbranding provisions without application to this great branch of the subject of the act.

Nor are these affirmative indications of the intent of Congress to be overruled on the theory advanced in the argument below that such statements of curative properties of patent medicines are matters of scientific opinion and that Congress has no power to control them.

As the bill passed the Senate it contained the word "knowingly." Cong. Rec., vol. 40, pt. 1, p. 897. But that word was eliminated by the House amendment (H. R. Rep. 2118, 59th Cong., 1st sess.), and without the word the bill became a law.

Our jurisprudence does not place matters beyond legal control merely because their correct solution may depend upon opinion. See *Buttfield* v. *Stranahan*, 192 U. S. 470; Act of July 1, 1902, c. 1378, 32 Stat. L. 728, and see also annual appropriation acts for the Department of Agriculture, June 30, 1906, 34 Stat. 674; Mar. 4, 1907, 34 Stat. 1260; May 23, 1908, 35 Stat. 254; Mar. 4, 1909, 35 Stat. 1043; May 26, 1910, 36 Stat. 419; August 30, 1890 (ch.

839, 26 Stat. 414); *Crossman* v. *Lurman*, 192 U. S. 189; acts of August 3, 1888, c. 376, 22 Stat. 214; March 3, 1891, c. 551, 26 Stat. 1084; and see *State* v. *Board of Examiners*, 32 Minnesota, 324; *People* v. *McCoy*, 125 Illinois, 289; *Dent* v. *West Virginia*, 129 U. S. 114.

The law of malpractice holds a physician to that degree of skill and learning which is possessed by the average member of his profession. *Pike* v. *Housinger*, 155 N. Y. 201; *Logan* v. *Field*, 75 Mo. App. 594; *Jackson* v. *Burnham*, 20 Colorado, 532; *Patten* v. *Wiggin*, 51 Maine, 594; *Nelson* v. *Harrington*, 72 Wisconsin, 591.

The laws for the determination of insanity and the segregation of the insane, and in general all health and quarantine laws, stand entirely upon matters of scientific opinion. *Edgington* v. *Fitzmaurice*, 29 L. R. Ch. Div. 459.

Even in this class of cases matters which may theoretically be matters of opinion or state of mind are not exempt from the notice of the law. *Durland* v. *United States*, 161 U. S. 306; *Butler* v. *Watkins*, 13 Wall. 456; *Mo. Drug Co.* v. *Wyman*, 129 Fed. Rep. 623; *Rogers* v. *Va. Car. Chem. Co.*, 149 Fed. Rep. 1, 78 C. C. A. 615; *Ten Mile Coal & Coke Co.* v. *Burt*, 170 Fed. Rep. 332; *Kohler Mfg. Co.* v. *Beeshore*, 59 Fed. Rep. 572; *Fenwick* v. *Grimes*, 8 Fed. Cases, 4734, 5 Cranch C. C. 603; *Hedin* v. *Minn. Medical Institute*, 62 Minnesota, 146; *Olston* v. *Oreg. Water Power Co.* (Ore.), 96 Pac. Rep. 1095; *Walters* v. *Rock* (N. Dak.), 115 N. W. Rep. 511; *McDonald* v. *Smith*, 139 Michigan, 211; *Nowlin* v. *Snow*, 40 Michigan, 699; *Totten* v. *Burhans*, 91 Michigan, 495; *Stoney Creek Woolen Co.* v. *Smalley*, 111 Michigan, 321; *Johnson* v. *Monell* (N. Y.), 2 Keyes, 655; *Stewart* v. *Emerson*, 52 N. H. 301; *Bugham* v. *Bank*, 159 Pa. 94; *Ayres* v. *French*, 41 Connecticut, 142; *Down* v. *Tucker*, 41 Connecticut, 197; *Laing* v. *McKee*, 13 Michigan, 124; *Sweet* v. *Kimball*, 166 Massachusetts, 333; *Adams* v. *Gillig*, 139 App. Div. (N. Y.) 494; *Smith* v. *Smith* (Ala.), 45 So. Rep. 168; *Brady* v. *Elliott*, 146 N. Car. 578; *Carr* v.

*Craig* (Iowa), 116 N. W. Rep. 720; *City Deposit Bank* v. *Green* (Iowa), 115 N. W. Rep. 893; *Wolfe* v. *Burke,* 56 N. Y. 115, 122; *Edgington* v. *Fitzmaurice,* 29 L. R. Ch. Div. 459, *supra. Am. School of Healing* v. *McAnnulty,* 187 U. S. 94, distinguished.

From the point of view necessary to be taken by a legislature, these statements of cure-all properties of patent medicines are not in any real scientific sense matters of opinion. They are charlatanic and their falseness is generally demonstrable without real dispute. See the code of the American Medical Association, 1883, Art. 1, § 3.

The constitutional power of Congress to prohibit use of the instruments of interstate commerce to the injury of the public is no longer open to question. *Reid* v. *Colorado,* 187 U. S. 137, 146; *The Lottery Case,* 188 U. S. 321; *Buttfield* v. *Stranahan,* 192 U. S. 470, 492–493; *Crossman* v. *Lurman,* 192 U. S. 189, 199, 200; *St. L. & I. M. Ry.* v. *Taylor,* 210 U. S. 281, 287.

And see the following cases upholding the constitutionality of this act. *United States* v. *Seventy-four Cases of Grape Juice,* 181 Fed. Rep. 629; *Shawnee Milling Co.* v. *Temple,* 179 Fed. Rep. 517.

This power does not exist in the States because delegated to the Federal authority. *Bowman* v. *Railway Co.,* 125 U. S. 465; *Leisy* v. *Hardin,* 135 U. S. 100, 108. See *Re Rahrer,* 140 U. S. 545.

The statute is remedial, and should not be narrowly construed. In this respect it is like the Interstate Commerce Act—a remedial statute with penal incidental features. *N. H. R. R.* v. *Int. Com. Comm.,* 200 U. S. 361, 391; *Taylor* v. *United States,* 3 How. 191.

*Mr. James H. Harkless,* with whom *Mr. Charles S. Crysler* and *Mr. Clifford Histed* were on the brief, for defendant in error:

The purpose of the statute is to secure pure food and drugs.

As related to drugs the term "misbranded" used in § 8 is confined to representations concerning the identity of the drug, its physical constituents, or chemical ingredients. It does not refer to claims for curative properties of such drugs.

A claim that certain beneficial results will follow the use of a prescribed drug or medicine obviously is not a statement of an existing fact, but is a forecast concerning a future event and is in the nature of things an expression of an opinion.

The court will take judicial notice that there are many different schools of medicine whose methods of treatment, and whose opinions concerning the curative properties of drugs and medicines, radically differ—some refusing to ascribe any medicinal virtue to any drug under any circumstances. No method has yet been devised by finite man to harmonize these warring factions, and indeed, it cannot be said that the truth lies entirely with any one of them. Congress cannot under the circumstances be deemed to have intended by this legislation to invade a field so speculative and conjectural—certainly not in the absence of apt language clearly and irresistibly evincing such a purpose.

The drug is the subject-matter of the commerce. The brand or label which it bears is but an incident to the commodity itself and forms a part of the commerce in the article only in so far as it deals with the identity of the commodity contained in the package. But a statement which gives no information concerning the commodity itself, its physical constituents, or its chemical ingredients is not so related to the commodity as to form a part of the commerce in the article and is not, therefore, a part and parcel of the commerce within the regulating power contemplated by this statute.

This is a criminal statute creating and denouncing a new offense. All matters of doubtful interpretation are

to be resolved in favor of the defendant and he should not be subjected to its pains and penalties except upon clear and undoubted warrant from the plain and inevitable language of the statute.

The construction sought by the Government that this statute extends to claims concerning the curative properties of medicines or drugs would render the statute void as being beyond the power of Congress to enact.

By not giving to the statute an extreme and strained construction, grave and doubtful constitutional questions are avoided, and at the same time it is susceptible to such reasonable interpretation as to make it a vital and effective instrument in curing the manifest evils which prompted its enactment. Under such circumstances, therefore, there is no occasion for resorting to such doubtful and forced interpretation.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is an indictment for delivering for shipment from Missouri to Washington, D. C., packages and bottles of medicine bearing labels that stated or implied that the contents were effective in curing cancer, the defendant well knowing that such representations were false. On motion of the defendant the District Judge quashed the indictment (177 Fed. Rep. 313), and the United States brought this writ of error under the Act of March 2, 1907, c. 2564, 34 Stat. 1246.

The question is whether the articles were misbranded within the meaning of § 2 of the Food and Drugs Act of June 30, 1906, c. 3915, 34 Stat. 768, making the delivery of misbranded drugs for shipment to any other State or Territory or the District of Columbia a punishable offense. By § 6 the term drug includes any substance or mixture intended to be used for the cure, mitigation or prevention of disease. By § 8, c. 3915, 34 Stat., p. 770, the

term misbranded "shall apply to all drugs, or articles of
food, . . . the package or label of which shall bear
any statement, design, or device regarding such article,
or the ingredients or substances contained therein which
shall be false or misleading in any particular, and to any
food or drug product which is falsely branded as to the
State, Territory, or country in which it is manufactured or
produced. . . . An article shall also be deemed to be
misbranded: In case of drugs: First. If it be an imitation
of or offered for sale under the name of another article.
Second. [In case of a substitution of contents,] or if the
package fail to bear a statement on the label of the quan-
tity or proportion of any alcohol, morphine, opium, co-
caine, heroin, alpha or beta eucaine, chloroform, cannabis
indica, chloral hydrate, or acetanilide, or any derivative or
preparation of any such substances contained therein."

It is a postulate, as the case comes before us, that in a
certain sense the statement on the label was false, or, at
least, misleading. What we have to decide is whether
such misleading statements are aimed at and hit by the
words of the act. It seems to us that the words used con-
vey to an ear trained to the usages of English speech a
different aim; and although the meaning of a sentence is
to be felt rather than to be proved, generally and here the
impresson may be strengthened by argument, as we shall
try to show.

We lay on one side as quite unfounded the argument
that the words 'statement which shall be misleading in
any particular' as used in the statute do not apply to
drugs at all—that the statements referred to are those
'regarding such article,' and that 'article' means article
of food, mentioned by the side of drugs at the beginning
of the section. It is enough to say that the beginning of
the sentence makes such a reading impossible, and that
article expressly includes drugs a few lines further on in
what we have quoted, not to speak of the reason of the

thing. But we are of opinion that the phrase is aimed not at all possible false statements, but only at such as determine the identity of the article, possibly including its strength, quality and purity, dealt with in § 7. In support of our interpretation the first thing to be noticed is the second branch of the sentence: 'Or the ingredients or substances contained therein.' One may say with some confidence that in idiomatic English this half, at least, is confined to identity, and means a false statement as to what the ingredients are. Logically it might mean more, but idiomatically it does not. But if the false statement referred to is a misstatement of identity as applied to a part of its objects, idiom and logic unite in giving it the same limit when applied to the other branch, the article, whether simple or one that the ingredients compose. Again, it is to be noticed that the cases of misbranding, specifically mentioned and following the general words that we have construed, are all cases analogous to the statement of identity and not at all to inflated or false commendation of wares. The first is a false statement as to the country where the article is manufactured or produced; a matter quite unnecessary to specify if the preceding words had a universal scope, yet added as not being within them. The next case is that of imitation and taking the name of another article, of which the same may be said, and so of the next, a substitution of contents. The last is breach of an affirmative requirement to disclose the proportion of alcohol and certain other noxious ingredients in the package—again a matter of plain past history concerning the nature and amount of the poisons employed, not an estimate or prophecy concerning their effect. In further confirmation, it should be noticed that although the indictment alleges a wilful fraud, the shipment is punished by the statute if the article is misbranded, and that the article may be misbranded without any conscious fraud at all. It was natural enough to throw this risk on

shippers with regard to the identity of their wares, but a
very different and unlikely step to make them answerable
for mistaken praise. It should be noticed still further that
by § 4 the determination whether an article is misbranded
is left to the Bureau of Chemistry of the Department of
Agriculture, which is most natural if the question con-
cerns ingredients and kind, but hardly so as to medical
effects.

To avoid misunderstanding we should add that, for the
purposes of this case, at least, we assume that a label
might be of such a nature as to import a statement con-
cerning identity, within the statute, although in form
only a commendation of the supposed drug. It may be
that a label in such form would exclude certain substances
so plainly to all common understanding as to amount to
an implied statement of what the contents of the package
were not; and it may be that such a negation might fall
within the prohibitions of the act. It may be, we express
no opinion upon that matter, that if the present indict-
ment had alleged that the contents of the bottles were
water, the label so distinctly implied that they were other
than water, as to be a false statement of fact concerning
their nature and kind. But such a statement as to con-
tents, undescribed and unknown, is shown to be false only
in its commendatory and prophetic aspect, and as such
is not within the act.

In view of what we have said by way of simple inter-
pretation we think it unnecessary to go into considerations
of wider scope. We shall say nothing as to the limits of
constitutional power, and but a word as to what Congress
was likely to attempt. It was much more likely to regulate
commerce in food and drugs with reference to plain mat-
ter of fact, so that food and drugs should be what they pro-
fessed to be, when the kind was stated, than to distort
the uses of its constitutional power to establishing criteria
in regions where opinions are far apart. See *School of*

*Magnetic Healing* v. *McAnnulty*, 187 U. S. 94. As we have said above, the reference of the question of misbranding to the Bureau of Chemistry for determination confirms what would have been our expectation and what is our understanding of the words immediately in point.

*Judgment affirmed.*

MR. JUSTICE HUGHES, with whom MR. JUSTICE HARLAN and MR. JUSTICE DAY concurred, dissenting:

I am unable to concur in the judgment in this case, for the following reasons:

The defendant was charged with delivering for shipment in interstate commerce certain packages and bottles of drugs alleged to have been misbranded in violation of the Food and Drugs Act of June 30, 1906, chapter 3915, 34 Stat. 768.

The articles were labeled respectively "Cancerine tablets," "Antiseptic tablets," "Blood purifier," "Special No. 4," "Cancerine No. 17," and "Cancerine No. 1,"— the whole constituting what was termed in substance "Dr. Johnson's Mild Combination Treatment for Cancer." There were several counts in the indictment with respect to the different articles. The labels contained the words "Guaranteed under the Pure Food and Drugs Act, June 30, 1906;" and some of the further statements were as follows:

"Blood Purifier. This is an effective tonic and alterative. It enters the circulation at once, utterly destroying and removing impurities from the blood and entire system. Acts on the bowels, kidneys, and skin, eliminating poisons from the system, and when taken in connection with the Mild Combination Treatment gives splendid results in the treatment of cancer and other malignant diseases. I always advise that the Blood Purifier be continued some little time after the cancer has been killed and removed and the sore healed.

"Special No. 4. . . . It has a strong stimulative and absorptive power; will remove swelling, arrest development, restore circulation, and remove pain. Is indicated in all cases of malignancy where there is a tendency of the disease to spread, and where there is considerable hardness surrounding the sore. Applied thoroughly to a lump or to an enlarged gland will cause it to soften, become smaller, and be absorbed.

"Cancerine No. 1. . . . Tendency is to convert the sore from an unhealthy to a healthy condition and promote healing. Also that it destroys and removes dead and unhealthy tissue."

In each case the indictment alleged that the article was "wholly worthless," as the defendant well knew.

In quashing the indictment the District Court construed the statute. The substance of the decision is found in the following words of the opinion: "Having regard to the intendment of the whole act, which is to protect the public health against adulterated, poisonous, and deleterious food, drugs, etc., the labeling or branding of the bottle or container, as to the quantity or composition of 'the ingredients or substances contained therein which shall be false or misleading,' by no possible construction can be extended to an inquiry as to whether or not the prescription be efficacious or worthless to effect the remedy claimed for it." And the question on this writ of error is whether or not this construction is correct. *United States* v. *Keitel*, 211 U. S. 370.

What then is the true meaning of the statute?

Section 8 provides:

"SEC. 8. That the term 'misbranded,' as used herein, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such article, or the ingredients or substances contained therein which shall be false or misleading in any

particular, and to any food or drug product which is falsely branded as to the State, Territory, or country in which it is manufactured or produced."

The words "such article" in this section, as is shown by the immediate context, refer to "drugs" as well as to "food."

"Drugs" are thus defined in § 6:

"Sec. 6. That the term 'drug,' as used in this Act, shall include all medicines and preparations recognized in the United States Pharmacopœia or National Formulary for internal or external use, *and any substance or mixture of substances intended to be used for the cure, mitigation, or prevention of disease of either man or other animals."*

Articles, then, intended to be used for curative purposes, such as those described in the indictment, are within the statute, though they are not recognized in the United States Pharmacopœia or the National Formulary. And the offense of misbranding is committed if the package or label of such an article bears any statement regarding it "which shall be false or misleading in any particular."

But it is said that these words refer only to false statements which fix the identity of the article. According to the construction placed upon the statute by the court below in quashing the indictment, if one puts upon the market, in interstate commerce, tablets of inert matter or a liquid wholly worthless for any curative purpose as he well knows, with the label "Cancer Cure" or "Remedy for Epilepsy," he is not guilty of an offense, for in the sense attributed by that construction to the words of the statute he has not made a statement regarding the article which is false or misleading in any particular.

I fail to find a sufficient warrant for this limitation, and on the contrary, it seems to me to be opposed to the intent of Congress and to deprive the act of a very salutary effect.

It is strongly stated that the clause in § 8,—"or the ingredients or substances contained therein,"—has reference to identity and that this controls the interpretation of the entire provision. This, in my judgment, is to ascribe an altogether undue weight to the wording of the clause and to overlook the context. The clause, it will be observed, is disjunctive. If Congress had intended to restrict the offense to misstatements as to identity, it could easily have said so. But it did not say so. To a draftsman with such a purpose the language used would not naturally occur. Indeed, as will presently be shown, Congress refused, with the question up, so to limit the statute.

Let us look at the context. In the very next sentence, the section provides (referring to drugs) that an article shall "*also*" be deemed to be misbranded if it be "an imitation of or offered for sale under the name of another article," or in case of substitution of contents or of failure to disclose the quantity or proportion of certain specified ingredients, if present, such as alcohol, morphine, opium, cocaine, etc.

It is a matter of common knowledge that the "substances" or "mixtures of substances" which are embraced in the act, although not recognized by the United States Pharmacopœia or National Formulary, are sold under trade names without any disclosure of constituents, save to the extent necessary to meet the specific requirements of the statute. Are the provisions of the section to which we have referred, introduced by the word "*also*," and the one relating to the place of manufacture, the only provisions as to descriptive statements which are intended to apply to these medicinal preparations? Was it supposed that with respect to this large class of compositions, nothing being said as to ingredients except as specifically required, there could be, within the meaning of the act, no false or misleading statement in

any particular? If false and misleading statements regarding such articles were put upon their labels, was it not the intent of Congress to reach them? And was it not for this very purpose that the general language of § 8 was used?

The legislative history of the section would seem to negative the contention that Congress intended to limit the provision to statements as to identity. The provision in question as to misbranding, as it stood in the original bill in the Senate (then § 9) was as follows:

"If the package containing it, or its label, shall bear any statement regarding the ingredients or the substances contained therein, which statement shall be false or misleading in any particular."

The question arose upon this language whether or not it should be taken as limited strictly to statements with respect to identity. It was insisted that the words had a broader range and the effort was made to procure an amendment which should be so specific as to afford no basis for the conclusion that any thing but false statements as to identity or constituents was intended. An amendment was then adopted in the Senate making the provision read:

"any statement as to the *constituent* ingredients, or the substances contained therein, which statement shall be false or misleading in any particular."

With this amendment the bill was passed by the Senate and went to the House. There the provision was changed by striking out the word "constituent" and inserting the word "regarding," so that it should read:

"any statement regarding the ingredients or substances contained in such article, which statement shall be false or misleading in any particular."

Finally, it appears, that in conference the bill was amended by inserting the words "*design, or device,*" and also the words "*such article, or;*" and thus the section be-

came a part of the law in its present form—containing
the words:
"any statement, design, or device regarding such article,
or the ingredients or substances contained therein which
shall be false or misleading in any particular."

It is difficult to suppose that, with the question dis-
tinctly raised, Congress would have rejected the provision
of the Senate bill and broadened the language in the man-
ner stated if it had been intended to confine the prohibi-
tion to false statements as to identity. Reading the act
with the sole purpose of giving effect to the intent of Con-
gress, I cannot escape the conclusion that it was designed
to cover false and misleading statements of fact on the
packages or labels of articles intended for curative pur-
poses, although the statements relate to curative properties.

It is, of course, true, that when Congress used the words
"false or misleading statement" it referred to a well
defined category in the law and must be taken to have
intended statements of *fact* and not mere expressions of
opinion.

The argument is that the curative properties of articles
purveyed as medicinal preparations are matters of opinion,
and the contrariety of views among medical practitioners,
and the conflict between the schools of medicine, are im-
pressively described. But, granting the wide domain of
opinion, and allowing the broadest range to the conflict
of medical views, there still remains a field in which state-
ments as to curative properties are downright falsehoods
and in no sense expressions of judgment. This field I be-
lieve this statute covers.

The construction which the District Court has placed
upon this statute is that it cannot be extended to any case
where the substance labeled as a cure, with a description
of curative properties, is "wholly worthless" and is
known by the defendant to be such. That is the charge
of the indictment.

The question then is whether, if an article is shipped in interstate commerce, bearing on its label a representation that it is a cure for a given disease, when on a showing of the facts there would be a unanimous agreement that it was absolutely worthless and an out and out cheat, the act of Congress can be said to apply to it. To my mind the answer appears clear. One or two hypothetical illustrations have been given above. Others may readily be suggested. The records of actual prosecutions, to which I am about to refer, shows the operation the statute has had and I know of no reason why this should be denied to it in the future.

Our attention has been called to the construction which was immediately placed upon the enactment by the officers charged with its enforcement in the Department of Justice and the Department of Agriculture. It is true that the statute is a recent one, and, of course, the question is one for judicial decision. But it is not amiss to note that the natural meaning of the words used in the statute, reflected in the refusal of Congress to adopt a narrower provision, was the meaning promptly attributed to it in the proceedings that were taken to enforce the law. And this appears to have been acquiesced in by the defendants in many prosecutions in which the defendants pleaded guilty. We have been referred to the records of the Department of Agriculture showing nearly thirty cases in which either goods had been seized and no defense made, or pleas of guilty had been entered. Among these are found such cases as the following:

"No. 29. Hancock's Liquid Sulphur, falsely represented, among other things, to be 'Nature's Greatest Germicide. . . . The Great Cure for . . . Diptheria.' Investigation begun November 22, 1907. Plea of guilty."

"No. 180. Gowan's Pneumonia Cure, falsely represented, among other things, that it 'Supplies an easily

absorbed food for the lungs that quickly effects a permanent cure.' Investigation begun November 22, 1907. Criminal information. Plea of guilty."

"No. 181. 'Eyelin,' falsely represented, among other things, that it 'Repairs and Rejuvenates the Eye and Sight.' Investigation begun February 13, 1908. Plea of guilty."

"No. 261. 'Sure Thing Tonic,' falsely represented, among other things, to be 'Sure Thing Tonic. . . . Restores Nerve Energy. Renews Vital Force.' Investigation begun June 3, 1909. Pleaded guilty."

"No. 424. 'Tuckahoe Lithia Water,' falsely represented, among other things, to be 'a sure solvent for calculi, either of the kidneys or liver, especially indicated in all diseases due to uric diathesis, such as gout, rheumatism, gravel stone, incipient diabetes, Bright's Disease, inflamed bladder, eczema, stomach, nervous, and malarial disorders.' Investigation begun July 9, 1908. Plea of guilty."

"No. 427. 'Cancerine,' falsely represented, among other things, to be 'A remarkably curative extract which if faithfully adhered to will entirely eradicate cancerous poison from the system. . . . A specific cure for cancer in all its forms.' Investigation begun about April 12, 1909. Criminal information. Plea of guilty."

I find nothing in the language of the statute which requires the conclusion that these persons who have confessed their guilt in making false and misleading statements on their labels should be privileged to conduct their interstate traffic in their so-called medicines, admittedly worthless, because Congress did not intend to reach them.

Nor does it seem to me that any serious question arises in this case as to the power of Congress. I take it to be conceded that misbranding may cover statements as to strength, quality and purity. But so long as the statement is not as to matter of opinion, but consists of a false

representation of fact—in labeling the article as a cure when it is nothing of the sort from any point of view, but wholly worthless—there would appear to be no basis for a constitutional distinction.   It is none the less descriptive— and falsely descriptive—of the article.   Why should not worthless stuff, purveyed under false labels as cures, be made contraband of interstate commerce,—as well as lottery tickets?   *Champion* v. *Ames*, 188 U. S. 331.

I entirely agree that in any case brought under the act for misbranding,—by a false or misleading statement as to curative properties of an article,—it would be the duty of the court to direct an acquittal when it appeared that the statement concerned a matter of opinion.   Conviction would stand only where it had been shown that, apart from any question of opinion, the so-called remedy was absolutely worthless and hence the label demonstrably false; but in such case it seems to me to be fully authorized by the statute.

Accordingly, I reach the conclusion that the court below erred in the construction that it gave the statute, and hence in quashing the indictment, and that the judgment should be reversed.

I am authorized to say that MR. JUSTICE HARLAN and MR. JUSTICE DAY concur in this dissent.