**UNITED STATES of America,**
**Plaintiff,**

v.

**C. William GERKEN, Defendant.**

**Crim. No. 46097.**

United States District Court
E. D. New York.

April 14, 1960.

Cornelius W. Wickersham, Jr., U. S. Atty., for plaintiff, by Averill M. Williams.

Robinson, Thebner & McLaughlin, New York City, for defendant. Emanuel Thebner and Abraham S. Robinson, New York City, of counsel.

ZAVATT, District Judge.

This is a case of first impression in which the defendant moves to dismiss the one-count indictment which charges him with a violation of 18 U.S.C. § 220 as follows:

The Grand Jury Charges:

That on or about the 24th day of April 1957, within the Eastern District of New York, the defendant, C. William Gerken, who was then and there a vice president of the Security National Bank of Long Island, the deposits of which bank were insured by the Federal Deposit Insurance Corporation, did knowingly, wilfully and unlawfully receive a fee, commission and thing of value from a corporation for endeavoring to procure a loan for such corporation from a bank whose deposits were insured by the Federal Deposit Insurance Corporation, to wit: that

he did receive Two Thousand Seven Hundred Fifty Dollars ($2,750.00) from the Huntington Station Realty Corp. for endeavoring to procure a loan from the Riverhead Savings Bank in the amount of Two Hundred Seventy-five Thousand Dollars ($275,000.00) for the benefit of said corporation.

(Title 18 United States Code, § 220.)

The defendant contends that no violation of § 220 is charged because the money which he received from the Huntington Station Realty Corp. was not received for endeavoring to procure a loan for that corporation from the bank of which he was an officer. The Government contends that the language of § 220 is so broad as to include a transaction such as is set forth in the indictment. It is the Government's contention that no officer of a bank whose deposits are insured by the Federal Deposit Insurance Corporation may lawfully receive a fee, commission or thing of value from a borrower for procuring or endeavoring to procure for that borrower a loan from any bank whose deposits are insured by the Federal Deposit Insurance Corporation, regardless of whether or not the person procuring such a loan is an officer of the lender bank; that it is sufficient that this person be an officer of a bank whose deposits are so insured to bring him within the ambit of § 220.

Prior to the 1948 revision of Title 18 U.S.C., the acts now proscribed by 18 U.S.C. § 220 were covered by three separate sections of Title 12, to wit: sections 595, 1125 and 1315.[1] They were

---

[1] 12 U.S.C. § 595 (1946)

"Officers, directors, and employees; commissions and gifts for procuring loans, etc.

"Except as herein provided, any officer, director, employee, or attorney of a member bank who stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value from any person, firm, or corporation for procuring or endeavoring to procure for such person, firm, or corporation, or for any other person, firm, or corporation, any loan from or the purchase or discount

of any paper, note, draft, check, or bill of exchange by such member bank shall be deemed guilty of a misdemeanor and shall be imprisoned not more than one year or fined not more than $5,000, or both."

12 U.S.C. § 1125 (1946)

"Offenses by officers, employees, or agents of banks; receiving fees or gifts.

"Whoever, being an officer, director, employee, agent, or attorney of a Federal intermediate credit bank, stipulates for or receives or consents or agrees to receive any fee, commission, gift, or

then consolidated into 18 U.S.C. § 220, with minor changes, to read as follows:

"§ 220. Receipt of commissions or gifts for procuring loans

"Whoever, being an officer, director, employee, agent, or attorney of a member bank of the Federal Reserve System, of a Federal intermediate credit bank, or of a National Agricultural Credit Corporation, except as provided by law, stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value, from any person, firm, or corporation, for procuring or endeavoring to procure for such person, firm, or corporation, or for any other person, firm, or corporation, from any such bank or corporation, any loan or extension or renewal of loan or substitution of security, or the purchase or discount or acceptance of any paper, note, draft, check, or bill of exchange by any such bank or corporation, shall be fined not more than $5,000 or imprisoned not more than one year, or both."

The language of 12 U.S.C. § 595 leaves no doubt that an officer of a member bank committed no offense thereunder if he received a fee, commission, gift or other thing of value for procuring or endeavoring to procure a loan by a bank other than the member bank of which he was an officer. The phrase "such member bank" in that section clearly re-

fers to the member bank of which the person charged is an officer. 12 U.S.C. §§ 1125 and 1315 applied respectively to officers of a Federal intermediate credit bank and a National Agricultural Credit Corporation. The phrase "any such corporation" which appeared in both of these sections clearly refers back to the Federal intermediate credit bank or the National Agricultural Credit Corporation, as the case may be, of which the person charged was an officer. The language of these two sections leaves no doubt that such an officer committed no offense thereunder if he received a fee, commission, gift or thing of value for procuring or endeavoring to procure a loan for a person by either one of such corporate institutions other than the institution of which he was an officer.

When the consolidation of these three sections of Title 12 into section 220 of Title 18 was under consideration by Congress in 1948, the Committee on the Judiciary of the House of Representatives filed a report to accompany the House bill (H.R. 3190) in which it is crystal clear that the 1948 revision was made solely for the purposes of consolidation and with no intention to enlarge the scope of those three sections so as to make the 1948 revision applicable to persons to whom they had not had previously been applicable. The Committee on the Judiciary stated that "verbal changes were made for style purposes." H.R. Rep. No. 304, 80th Cong., 1st Sess. A21

thing of value, from any person, firm, or corporation for procuring or endeavoring to procure for such person, firm, or corporation, or for any other person, firm, or corporation any loan from any such corporation or extension or renewal of loan or substitution of security, or the purchase or discount or acceptance of any paper, note, draft, check, or bill of exchange by any such corporation, shall be deemed guilty of a misdemeanor and shall upon conviction thereof be imprisoned for not more than one year and fined not more than $5,000 or both."
12 U.S.C. § 1315 (1946)
"Taking of fees and gifts by officers; punishment.
"Whoever, being an officer, director,

employee, agent, or attorney of a National Agricultural Credit Corporation stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value from any person, firm, or corporation for procuring or endeavoring to procure for such person, firm, or corporation, or for any other person, firm, or corporation any loan from any such corporation or extension or renewal of loan or substitution of security, or the purchase or discount or acceptance of any paper, note, draft, check, or bill of exchange by any such corporation, shall be deemed guilty of a misdemeanor and upon conviction shall be imprisoned for not more than one year or fined not more than $5,000, or both."

(1947). As of the effective date of the 1948 revision of Title 18, § 220 thereof did not apply to an officer of a bank other than an officer "of a member bank" of the "Federal Reserve System." The Federal Deposit Insurance Act, 12 U.S.C., c. 16, §§ 1814 and 1815, requires every bank that is a member of the Federal Reserve System to be insured under the Federal Deposit Insurance Act. Non-member banks (National or State) may become insured banks. A National non-member bank must apply and receive certification by the Comptroller of the Currency. A State non-member bank must apply to and receive the approval of the Board of Directors of the Federal Reserve System.

In 1950, 18 U.S.C. § 220 was amended to read as follows:

> "§ 220. Receipt of commissions or gifts for procuring loans
>
> "Whoever, being an officer, director, employee, agent, or attorney of any bank, the deposits of which are insured by the Federal Deposit Insurance Corporation, of a Federal intermediate credit bank, or of a National Agricultural Credit Corporation, except as provided by law, stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value, from any person, firm or corporation, for procuring or endeavoring to procure for such person, firm, or corporation, or for any other person, firm, or corporation, from any such bank or corporation, any loan or extension or renewal of loan or substitution of security, or the purchase or discount or acceptance of any paper, note, draft, check, or bill of exchange by any such bank or corporation, shall be fined not more than $5,000 or imprisoned not more than one year or both."
>
> 64 Stat. 894.

This amendment made the section applicable to officers of non-member banks whose deposits are insured by the Federal Deposit Insurance Corporation. The only change in language effected by the 1950 amendment was to substitute "any bank, the deposits of which are insured by the Federal Deposit Insurance Corporation" for "a member bank of the Federal Reserve System." Nothing in the legislative history of this 1950 amendment suggests an intention on the part of Congress to enlarge the scope of section 220 beyond making it applicable to officers of non-member banks just as it was previously applicable to officers of member banks. See H.Rep. No. 2564, 81st Cong., 2d Sess., U.S.Cong. & Adm. News, p. 3765 (1950).

"There is no more likely way to misapprehend the meaning of language—be it in a constitution, a statute, a will or a contract—than to read the words literally, forgetting the object which the document as a whole is meant to secure. Nor is a court ever less likely to do its duty than when, with an obsequious show of submission, it disregards the overriding purpose because the particular occasion which has arisen, was not foreseen." L. Hand, J., in Central Hanover Bank & Trust Co. v. Commissioner, 2 Cir., 1947, 159 F.2d 167, 169. This profound scholar who writes so pithily and incisively seeks what he has called "the full heart" and not merely the written words "for words are such temperamental things that the surest way to lose their essence is to take them at their face. Courts must reconstruct the past solution imaginatively in its setting and project the purposes which inspired it upon the concrete occasions which arise from their decision." L. Hand, "The Contribution of an Independent Judiciary to Civilization" in Jurisprudence in Action 228 (1953). The late Judge Frank expressed the same thought when he criticized "the one-word-one-meaning fallacy based on the false assumption that each verbal symbol refers to one and only one specific subject." Frank, Courts on Trial 299 (1949). We know from the Bible that the letter killeth and the spirit

giveth life. The meaning of a sentence in a statute "is to be felt rather than to be proved," said Holmes, J., in United States v. Johnson, 1911, 221 U.S. 488, 496, 31 S.Ct. 627, 55 L.Ed. 823. Judge Learned Hand affords us a share of his wisdom when he urges judges "not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, 2 Cir., 1945, 148 F.2d 737, 739. See also de-Sloover, The Equity and Reason of a Statute, 21 Corn.L.Q. 591 (1936).

■ The decision of this motion requires the court to break the crust of the verbiage in which § 220 is encased; to track the thread of purpose in search of the meaning which the legislature attempted to express. In this process, the tyranny of literalness is of little help—and more often a hindrance. By considering the legislative history we may find a rational content to the words quite different from what they appear to have as "plain words." The legislative history of a statute often suggests confinement of the mere words to the general purpose of the legislative scheme. See United States v. Witkovich, 1957, 353 U.S. 194, 199, 77 S.Ct. 779, 782, 1 L.Ed.2d 765.

Mr. Justice Frankfurter illuminates some guide posts along the route of statutory interpretation of criminal provisions of the law. He reminds us:

Generalities about statutory construction help us little. They are not rules of law but merely axioms of experience. * * * They do not solve the special difficulties in construing a particular statute. The variables render every problem of statutory construction unique. * * * For that reason we may utilize, in construing a statute not unambiguous, all the light relevant-

ly shed upon the words and the clause and the statute that express the purpose of Congress. * * * Particularly is this so when we construe statutes defining conduct which entail stigma and penalties and prison. Not that penal statutes are not subject to the basic consideration that legislation like all other writings should be given, insofar as the language permits, a commonsensical meaning. But when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication. United States v. Universal C. I. T. Credit Corp., 1952, 344 U.S. 218, 221–222, 73 S.Ct. 227, 229, 97 L.Ed. 260.

■ On December 31, 1949, of a total of 14,687 operating commercial and mutual savings banks in the United States, 13,628 were institutions whose deposits were insured. U.S.Code Cong. & Adm. News, p. 3766 (1950). The Government would have the court so construe section 220 that an attorney for one insured bank could not receive a fee for procuring a loan for a client by any one of the banking institutions throughout the United States so insured, no matter how remotely situated from his bank client, without becoming a criminal.

■ The legislative history of 18 U.S.C. § 220 plus the unreasonable and absurd consequences to which the interpretation urged by the Government would lead, satisfy the court that the indictment in the instant case does not allege a crime within the meaning of the statute.

The defendant's motion to dismiss the indictment is granted. Settle an order within 10 days.