UNITED STATES of America, Plaintiff–Appellee,

v.

Kenneth Martin JUMPER, Defendant–Appellant.

No. 87–1456.

United States Court of Appeals, Fifth Circuit.

Feb. 17, 1988.

Rehearing Denied March 16, 1988.

---

John H. Green, Odessa, Tex., for defendant-appellant.

Maury S. Epner, Washington, D.C., for plaintiff-appellee.

Before GARZA, REAVLEY and DAVIS, Circuit Judges.

GARZA, Circuit Judge:

## I

Kenneth Martin Jumper brings this appeal following his conviction of receiving a fee in return for procuring a bank loan. We affirm his conviction.

Mr. Jumper was the chairman of the board of directors and chief executive officer of the National Bank of Odessa in Odessa, Texas (National Bank). He was accused of accepting $100,000 for procuring a loan for Son's Fabrication (Son's). Son's sought to obtain a $2 million loan from National Bank but was declined because of substantial sums already owed by Son's to National Bank. Son's was informed by the National Bank that occasionally some of its investors were interested in participating in loan agreements. Some weeks later Son's was notified by an officer at National Bank that investors would be visiting Son's to discuss the loan. Mr. Jumper and Mr. William Sears visited Son's. Mr. Sears agreed to guarantee the $2 million loan in return for a fee.

On August 21, 1981, Mr. Jumper proposed to Mercantile National Bank of Dallas (Mercantile Bank) that they take full participation in the $2 million loan that National Bank would originate. Mr. Jumper informed Mercantile Bank that Mr. Sears was capable of guaranteeing the loan and would do so. For Mercantile Bank's participation, National Bank would place an additional $500,000 in a non-interest bearing account with Mercantile Bank.

On August 25, 1981, Son's co-owners, Terry Lawson and David Pearson, executed a $2 million promissory note payable to National Bank. The Son's promissory note was then assigned to the Mercantile Bank.

On August 26, 1981, Son's sent a letter to Mr. Sears detailing their agreement. The letter stated in part:

The acquisition costs of the related drilling components will be approximately $2.4 to 2.6 Million, with our fabrication costs approximately $4 to 5 Hundred Thousand making a total rig cost approximately $2.8 to 3.0 million. We estimate that under current market conditions we should be able to sell the Rig within a 90–120 day period for approximately $3.7 million.

In consideration for you guaranteeing a 2 million line of credit to build the Rig, we would make the following proposal:

1) Upon the sale of the Rig, Son's will pay to you $200,000.00 net of all expenses, if Rig sold and paid for by Nov. 23, 1981.

2) If the Rig sold and paid for after November 23, 1981, Son's will pay to you $250,000.00 net of all expenses.

Both Mr. Lawson and Mr. Pearson characterized this arrangement as a joint venture with Mr. Sears and had called it the "S and S" (Son's and Sears) project. The rig was not sold until January 1982.

On January 7, 1982, Son's drew a cashier's check in the amount of $250,000 from its National Bank account made payable to Mr. Sears. Mr. Sears deposited the check in his National Bank account. He transferred just over $100,000 to another account from which he issued a $100,000 check to Mr. Jumper. Mr. Jumper testified he received the $100,000, not for his role in obtaining the loan, but because he privately agreed with Mr. Sears to guarantee 40 percent of Son's loan. Since he accepted 40 percent of the risk, he was entitled to 40 percent of the profit. Mr. Jumper stated he executed a note to Mr. Sears confirming the arrangement, however, he was unable to produce any written record. Mr. Sears died before this trial began.

## II

Mr. Jumper was convicted under the former 18 U.S.C. § 215[1] which requires the government to prove four elements: (1) Mr. Jumper was an officer, or employee of a bank, the deposits of which were insured by the Federal Deposit Insurance Corporation (FDIC); (2) Mr. Jumper agreed to receive or received something of value from another; (3) Mr. Jumper endeavored to procure or procured for that other or anyone else; (4) a loan from the bank in which Mr. Jumper was employed. *United States v. Schoenhut*, 576 F.2d 1010, 1019 (3d Cir.), *cert. denied* 439 U.S. 964, 99 S.Ct. 450, 58

L.Ed.2d 421 (1978). This appeal is focused on the third and fourth elements.

The jury had the opportunity to determine the credibility of the witnesses including the testimony of Mr. Jumper with regard to receiving the $100,000. They apparently discredited his testimony.

This court is bound to examine the record in the light most favorable to the jury's guilty verdict, drawing all reasonable inferences in favor of that verdict. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Herron*, 816 F.2d 1036, 1042 (5th Cir.1987).

■ The evidence presented established Son's had executed a promissory note payable to National Bank for $2 million; National Bank assigned this note to Mercantile Bank; and Mercantile Bank agreed to take full participation in the loan which National Bank originated. The evidence also established Mercantile Bank agreed to accept assignment of Son's note after Mr. Jumper pledged $500,000 of National Bank's funds in a non-interest bearing account with Mercantile Bank; Mr. Jumper's confirmation of the financial ability of Mr. Sears; and National Bank's agreement that they would perform periodic inspections of Son's. Additionally, Son's paid Mr. Sears his $250,000 fee from which Mr. Sears paid Mr. Jumper $100,000. Finally, National Bank and Mercantile Bank were FDIC insured, and Mr. Jumper was an officer of the National Bank.

In his brief, Mr. Jumper contends the indictment fails to state a crime. He states the allegation in the indictment that the loan made from Mercantile Bank was a participation loan with National Bank and is not in violation of 18 U.S.C. § 215. We disagree.

---

1. The pertinent parts as enacted at the time of Mr. Jumper's conviction, provide:

   Whoever, being an officer, director, employee, agent or attorney of any [FDIC insured] bank, ... stipulates for or receives or consents or agrees to receive any fee, commission, gift, or thing of value, from any person,

   firm or corporation, for procuring or endeavoring to procure for such person, firm or corporation ... any loan ... by any such bank ... shall be fined not more than $5,000 or imprisoned not more than one year or both.

The purpose of 18 U.S.C. § 215 is to protect FDIC insured bank deposits by preventing unsound and improvident lines of credit from being made from such deposits by officers and directors of the bank. *United States v. Lane,* 464 F.2d 593 (8th Cir.) *cert. denied,* 409 U.S. 876, 93 S.Ct. 127, 34 L.Ed.2d 129 (1972); *United States v. Etheridge,* 414 F.Supp. 609 (E.D.Va. 1976). In addition, there can be no doubt that Congress' intent by enacting section 215 was to remove from the path of bank officials the temptation of self enrichment at the expense of the borrower *or bank. Ryan v. United States,* 278 F.2d 836, 838 (9th Cir.1960). Mr. Jumper committed $500,000 of his bank's money to the Mercantile Bank at his bank's expense for his own enrichment. We conclude Congress intended to prohibit an officer of an originating bank to accept a fee for procuring a loan from the participating bank.

Mr. Jumper next argues the government attempted to establish the loan was a participation loan between Mercantile Bank and National Bank, and that the loan was funded by National Bank and Mercantile Bank.

There may be any number of variations of a participation agreement which the banks agree to operate under. One form of a participation agreement exists where a bank elects not to make a requested loan, but contacts a second bank to request that it make the loan. Typically, the first or originating bank will advance the money to the customer on behalf of the second or participating bank. The participating bank would later reimburse the originating bank. The originating bank customarily will service the loan even though the loan is an asset of the participating bank. *See United States v. Riley,* 544 F.2d 237, 239 (5th Cir.1976). There is no absolute requirement that the money be advanced by the originating bank and then reimbursed by the participating bank. National Bank was servicing the loan and Mercantile Bank was funding the loan.

Andy Littlejohn stated at the time of the loan to Son's he was employed by Mercantile Bank as a correspondent banker.[2] He further stated he was familiar with the transaction between Mercantile Bank, National Bank and Mr. Sears. It was his understanding, "the loan was too big for National Bank of Odessa to completely handle it at the time and they requested that [Mercantile Bank] take a hundred percent participation in a loan that [National Bank] would originate." When asked about the involvement of the banks he stated:

[by Mr. Tom McHugh]

Q. And if you participate with a customer bank, in this case [National Bank], does [National Bank] still remain involved in this loan?

A. Well, in this case they had no funding. We funded 100 percent of the loan. There is a reason for doing it on that basis, you know. Obviously, we don't know the customer as well as they do, and we, you know, can't be out, you know, from Dallas to Odessa every week when a draw request, you know, might come about and there is no way for Mercantile Bank, if you will, to police a loan, police the proceeds, make sure they have gone into the project like they are supposed to. So [Mercantile Bank] asked that the National Bank of Odessa to make those inspections along the way, and, in fact, that was the part of our loan approval is that they do that on a periodic basis.

In further support of the existence of a participation agreement, Mr. Jumper sent a letter dated August 21, 1981, from the National Bank to Mr. Littlejohn at the Mercantile National Bank and in the last two paragraphs stated:

Son's needs a commitment of 2,000,000.-00 to handle this rig for approximately 90 to 120 days. I think there is a very good possibility that they will not need to draw the full amount prior to being sold. As I told you on the phone I will increase our demand account with you by $500,-

---

**2.** Mr. Littlejohn stated a correspondent banker was in charge of promoting bank relationships with smaller banks outside the immediate trade area.

000.00, and I have instructed our comptroller to float your balance at $750,-000.00.

Andy, we surely appreciate this accommodation, and if you need anything else, please let me know.

There is no doubt a participation agreement existed between banks. Mercantile Bank was funding and National Bank was servicing. The agreement, in effect, makes the banks partners to the transaction.

Mr. Jumper's next contention is that if he did accept a fee for procuring a participation loan for Son's he did not do so in violation of section 215. Mr. Jumper cites *United States v. Riley,* 544 F.2d 237 (5th Cir.1976), *cert. denied,* 430 U.S. 932, 97 S.Ct. 1554, 51 L.Ed.2d 777 (1977) to support his theory. Mr. Riley defended on the grounds that the loan had been participated out. *Riley* is distinguishable because the *Riley* court found the loan had not been participated out and did not discuss the applicability of section 215 to participation loans. Mr. Jumper also cites *United States v. Gerken,* 182 F.Supp. 738 (D.C.N. Y.1960) which held a bank officer of an FDIC insured bank did not commit an offense if he received a fee, commission, gift or thing of value for procuring or endeavoring to procure a loan for a realty corporation from another bank whose deposits were also insured by the FDIC. No participation agreement existed in *Gerken.* Mr. Gerken and his bank were not related to the bank making the loan to the realty corporation. In our case, Mr. Jumper's bank not only had a participation agreement with Mercantile Bank, but they also deposited $500,000 interest free to induce the Mercantile Bank to participate.

### III

We are holding section 215 extends to officers of an originating bank when a participation agreement exists. We believe Congress intended to prohibit this activity when they enacted section 215. We are further holding there was sufficient evidence which the jury could believe the $100,000 paid to Mr. Jumper by Mr. Sears was to procure Son's loan from the Nation-

al Bank which it later assigned to Mercantile Bank. The district court is therefore AFFIRMED.