**C. J. TOWER & SONS**

v.

**UNITED STATES.**

C.D. 2100; Protests Nos. 257669-K, 321367-K.

United States Customs Court, Third Division. July 13, 1959.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel), for plaintiff.

George Cochran Doub, Asst. Atty. Gen., Murray Sklaroff, and Sheila N. Ziff, New York City, for defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges.

DONLON, Judge.

Two protests are before us, consolidated for purposes of trial. The merchandise in controversy in both cases is pork meat which was imported from Canada at the port of Buffalo.

The official papers are in evidence.

The entry of protest 257669-K included various meats imported on September 14, 1954, by truck from the plant of Canada Packers, Limited, at West Toronto, Ontario, via Fort Erie, consigned to C. J. Tower & Sons, the importer of record and plaintiff here, at Buffalo. The merchandise, liquidation of which was protested, is described in the consumption entry as "6 bxs.—SP & DS Meats." The official papers show that this meat is pork backs, which were entered at a duty rate of 3¼ cents per pound under paragraph 703, and that the merchandise was liquidated as entered. The protest claims that "said merchandise is properly dutiable at 2¢ lb. under Par. 703 and T.D. 51802."

The entry of protest 321367-K likewise included various meats. These

were imported on April 16, 1957, by truck from the West Toronto plant of Canada Packers, Limited, via Fort Erie, consigned to plaintiff at Buffalo. There was included certain merchandise, described in the consumption entry as Smoked Pork Bacon, F.S. In Airtight Containers, 75 ctns.," and in the invoice as "Smoked Pork Bacon, F.S., 75 CTN. SMK F.S. Sliced Backs." The official papers show that these smoked sliced backs were entered at a rate of 3¼ cents per pound under paragraph 703 and that the merchandise was liquidated as entered. The protest claims that "flavor-sealed bacon and similar merchandise * * * is properly dutiable at 2¢ per lb. under Par. 703."

Both protests claim (although entries did not claim) the benefit of the modification of paragraph 703, Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 703, made by the General Agreement on Tariffs and Trade (GATT), effective January 1, 1948, and published as T.D. 51802. This modification reads as follows:

"Bacon, hams, and shoulders, and other pork, prepared or preserved, but not including any of the foregoing if cooked, boned, packed in air-tight containers, or made into sausages of any kind ................. 2¢ per lb."

Certain facts were stipulated on trial, exhibits were introduced into the record, and plaintiff adduced the testimony of one witness.

The stipulated facts include the following (R. 5):

"(1) All bacon is boned.

"(2) All canned pork products are cooked and boned.

"(3) Some bacon is canned.

"(4) Not all cooked pork products are canned.

"(5) Not all cooked pork products are boned."

Plaintiff's witness, Mr. Christian Thorsen of Toronto, identified himself as assistant to the general superintendent of Canada Packers, Limited. The business is meat packing. Mr. Thorsen has been with Canada Packers since 1927. He has been in the meat industry since 1913, first in his native Denmark and thereafter in England and Scotland, before coming to Canada. He now has supervisory duties in 12 Canadian and 2 midwestern American plants.

Mr. Thorsen explained the abbreviated invoice and entry descriptions of the protest merchandise as follows (R. 35, 36, 38, 39):

"SP PMSC backs are 'sweet-pickled, pea meal, short-cut backs.'

"F.S. sliced backs are flavor-sealed backs.

"The sweet-pickled backs are individually wrapped in parchment and packed six to a case, or box, for shipment. These backs are neither smoked nor sliced.

"The flavor-sealed backs are smoked and sliced. They are packaged in lots of 6 ounces; each 6-ounce lot is placed on a piece of white cardboard and then put into a plastic container, which is heat sealed and overlapped. A paper wrapping is then put around the plastic container. Twelve such packages of sliced bacon are put into a carton; there are six cartons to a case."

There seems to be no explanation in the record of the significance of "DS," a descriptive abbreviation that is used both in the entry and invoice for that meat which is more particularly described as sweet-pickled, pea-meal, short-cut backs, the merchandise of protest 257669–K.

There are in evidence three packages of bacon which, as to meat and the method of packaging it, are said to be representative of the bacon of protest 321367–K. (Exhibits 6 (one package) and 8 (two packages).) A cardboard base, plastic container, and parchment wrapper, typical of materials used in packaging the bacon, are also in evidence. (Exhibit 7.)

The issue in both protests is whether the merchandise is or is not within the

exclusionary language of the GATT modification of paragraph 703. If it is within the intent of that language, the merchandise is not entitled to the benefits of the GATT rate reduction. If it is not within the intent of that language, the merchandise is entitled to the benefits of the GATT rate reduction.

The meat of protest 257669–K is sweet-pickled pork backs, in chunks. It is "other" pork (not bacon, hams, or shoulders) that has been prepared or preserved. It is not cooked. It is boned. It is not packed in airtight containers. It has not been made into sausages of any kind.

The meat of protest 321367–K is sliced smoked bacon. It is the product "bacon," specifically enumerated in the GATT modification. It has not been cooked. It has been boned. It is for us to decide whether it is packed in airtight containers. It has not been made into sausages of any kind.

It is plaintiff's contention, as to the pickled pork backs, that although they are boned (as the bacon is) they are not cooked or packed in airtight containers, and that all three of these conditions must be conjoined in order for the backs to come within the language of the GATT exclusion. Defendant does not dispute the fact that these backs are boned and neither cooked nor packed in airtight containers; but contends that the boning alone suffices to bring these backs within the exclusionary GATT provision.

It is plaintiff's contention, as to the sliced bacon, that although boned (as the pork backs are) it is neither cooked nor packed in airtight containers, and that all three of these conditions must be conjoined in order for the bacon to fall within the GATT exclusion. Defendant agrees that this bacon is boned but not cooked, and contends that it is packaged in airtight containers. Defendant concedes that boning alone would not suffice to take this bacon into the exclusionary GATT provision, but argues that the airtight containers do bring it within that provision.

The only issue of fact, then, is whether the bacon is packaged in an airtight container. We defer consideration of that issue of fact until we have decided the basic law issue which plaintiff raises, namely, the proper interpretation of the GATT provision. If plaintiff's views are correct, it is immaterial, on the agreed facts, whether the bacon packaging is or is not an airtight container.

The crux of the controversy is whether the three conditions set forth in the GATT modification of paragraph 703— "cooked, boned, packed in air-tight containers"—are to be read conjunctively or disjunctively. Plaintiff argues for the former; defendant, except in part as to the bacon, for the latter.

Although the language above quoted became effective in GATT January 1, 1948, and had previously, since January 1, 1939, been in the Canadian Trade Agreement (T.D. 49752), we cannot find that this language has previously been construed.

What did the GATT negotiators intend? The construction of a GATT modification presents, where the language used is not clear, a problem similar to the problem which is present in the construction of an unclear statute. It is the responsibility of the court to ascertain intention and give effect to it.

This the Supreme Court early pointed out in United States v. Hartwell, 6 Wall. 385, 73 U.S. 385, 18 L.Ed. 830:

" * * * The object in construing penal, as well as other statutes, is to ascertain the legislative intent. That constitutes the law. If the language be clear it is conclusive. There can be no construction where there is nothing to construe. The words must not be narrowed to the exclusion of what the legislature intended to embrace; but that intention must be gathered from the words, and they must be such as to leave no room for a reasonable doubt upon the subject. It must not be defeated by a forced and over-strict construction. The rule does not ex-

clude the application of common sense to the terms made use of in the act in order to avoid an absurdity, which the legislature ought not to be presumed to have intended." [6 Wall. pages 395, 396.]

In the current term of the Supreme Court, Mr. Justice Frankfurter, writing the principal opinion in United States v. Shirey, 359 U.S. 255, 79 S.Ct. 746, 749, 3 L.Ed.2d 789, said:

"Statutes, including penal enactments, are not inert exercises in literary composition. They are instruments of government, and in construing them 'the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down.' United States v. Whitridge, 197 U.S. 135, 143, 25 S.Ct. 406, 408, 49 L.Ed. 696. This is so because the purpose of an enactment is embedded in its words even though it is not always pedantically expressed in words. See United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 168, 74 L.Ed. 508. Statutory meaning, it is to be remembered, is more to be felt than demonstrated, see United States v. Johnson, 221 U.S. 488, 496, 31 S.Ct. 627, 55 L.Ed. 823, or, as Judge Learned Hand has somewhere put it, the art of interpretation is 'the proliferation of purpose.' In ascertaining this purpose it is important to remember that no matter how elastic is the use to which the terms scientific may be put, it cannot be used to describe the legislative process. That is a crude but practical process of the adaptation by the ordinary citizen of means to an end, except when it concerns technical problems beyond the ken of the average man.

"Applying these generalities to the immediate occasion, it is clear that the terms, the history, and the manifest purpose of 18 U.S.C. § 214, 18 U.S.C.A. § 214, coalesce in a construction of that statute which validates the information

against Shirey. The evil which Congress sought to check and the mischief wrought by what it proscribed are the same when the transaction is triangular as when only two parties are involved."

These cases and the cases cited therein, and others to like purport, require us first to ascertain whether the GATT provision is clear and, if it is not clear, then to interpret what was the purpose of the negotiators that is "embedded" in the words they used.

If the disputed language of the GATT modification of paragraph 703 had included the word "or," so that it read:

"* * * if cooked *or* boned *or* packed in air-tight containers, or made into sausages of any kind * * *"

or if, alternatively, it had included the word "and," so that it read:

"* * * if cooked *and* boned *and* packed in air-tight containers, or made into sausages of any kind * * *"

in either case the meaning would be clear. There would then be nothing for us to construe. But the GATT negotiators inserted neither the word "or" nor the word "and." They used, instead, commas. As written, the provision is:

"* * * if cooked, boned, packed in air-tight containers, or made into sausages of any kind."

There is sharp divergence of views as to what this language means. Do the commas connote a conjunctive or a disjunctive relation between "cooked, boned, packed in air-tight containers"? We conclude that the language is not clear. There is here something for us to construe.

We must, therefore, proceed to ascertain whether there is some construction of this language in which, to paraphase the words of Mr. Justice Frankfurter, the terms which the negotiators used, the history of the modification, and the manifest purpose of the negotiators, coalesce.

Paragraph 703, Tariff Act of 1930, as it came from Congress, contains no such

language as that which is now in controversy. As enacted, effective June 17, 1930, paragraph 703 read (the language subsequently modified by the GATT provision now before us for construction being italicized for emphasis):

"Swine, 2 cents per pound; pork, fresh, chilled, or frozen, 2½ cents per pound; *bacon, hams, and shoulders, and other pork, prepared or preserved, 3¼ cents per pound;* lard, 3 cents per pound; lard compounds and lard substitutes, 5 cents per pound."

Effective January 1, 1939, the President proclaimed (T.D. 49752) the modification of paragraph 703 (and other paragraphs not pertinent to the issue here) by a trade agreement negotiated between the United States and Canada, pursuant to the authority of section 350 (a) of the Tariff Act of 1930, as amended, 19 U.S.C.A. § 1351. The relevant language of paragraph 703 was modified to read as follows (the new language being italicized for emphasis):

"Bacon, hams, and shoulders, and other pork, prepared or preserved, *but not cooked, boned, packed in airtight containers, or made into sausages of any kind*...............2¢ per lb."

There was no further modification of this provision of paragraph 703 until the President, effective January 1, 1948, proclaimed the modification that was negotiated in the General Agreement on Tariffs and Trade (T.D. 51802). As so modified, paragraph 703 reads as follows (the language newly added by the GATT modification being italicized for emphasis):

"Bacon, hams, and shoulders, and other pork, prepared or preserved, but not *including any of the foregoing if* cooked, boned, packed in air-tight containers, or made into sausages of any kind ................2¢ per lb."

It will be observed that while the GATT modification inserted new language of limitation, the effect of which

we shall later consider, no change was made in the standards of exclusion which had been earlier prescribed in the Canadian Trade Agreement, namely, "cooked, boned, packed in air-tight containers, or made into sausages of any kind." Nor was there any further concession in rate.

What evidence do we have as to the intention of the negotiators of the Canadian Trade Agreement?

Plaintiff has introduced into the record (exhibit 3) a printed document of 117 pages, which describes itself on the front cover page as press releases of the Department of State (United States, although not so stated), "The New Trade Agreement with Canada, signed November 17, 1938." This publication is identified as "Vol. XIX: No. 477, Supplement B, publication 1253." If there is a date of issue stated anywhere in the 117 pages of this document, diligent search fails to disclose it. Nor has plaintiff proved what the date of issue is.

We note the following statement on the cover page of the document:

"This information has been prepared by representatives of the Department of State, the Department of Agriculture, the Department of Commerce, the Department of the Treasury, and the Tariff Commission. These Government agencies, under the Reciprocal Trade Agreements Program, cooperate in the *formulation, negotiation, and conclusion of all trade agreements* entered into by the United States under the provisions of the Trade Agreements Act of 1934, as extended by a Joint Resolution of Congress on March 1, 1937." [Italics supplied.]

We note also that on page 1 it is stated: "The duty concessions of the new agreement are to be applied by both countries, effective January 1, 1939."

We conclude that the document was prepared either during negotiation of the trade agreement, or so nearly contemporaneously therewith as to reflect

the views of those agencies of the United States Government charged with official responsibility for "formulation, negotiation, and conclusion" of the agreement. It has some bearing on the issue of what their intention was.

There had been an earlier trade agreement with Canada, effective January 1, 1936, called the 1936 agreement. It was superseded by the 1939 agreement.

The circumstances taken into consideration by the negotiators in determining concessions to be made to Canada on agricultural products in the 1939 agreement are recited in exhibit 3, as follows:

"(1) Canada is a great agricultural country and, if important concessions were to be secured from Canada on a wide range of commodities, it was obviously necessary to grant important concessions to Canada on farm products.

"(2) The United States is a far larger producer of most farm products than Canada. Consequently, imports into this country from Canada, even though they may represent a considerable share of that country's output, will in most cases be small compared with our domestic production.

"(3) The extreme and repeated droughts of recent years which led to a shortage in the domestic production of grains and meats, and permitted considerable imports during a number of years, are no longer a factor. The United States is normally a net exporter of most farm products, and this position is already being resumed.

"(4) The trade agreement with the United Kingdom, made at the same time as that with Canada, contains many concessions of benefit to American agriculture. Several of the concessions thus obtained involve the relinquishment, in whole or in part, of tariff preferences which Canada had previously held in the British market.

"(5) Concessions important to certain branches of American agriculture had been obtained from Canada in the 1936 agreement, and further concessions in this field appear in the new agreement.

"(6) Under the 1936 agreement Canada reduced its duties on a wide range of manufactured goods. There followed a marked increase in imports from this country. Many additional concessions on factory products are being made by Canada in the new agreement, and further growth in this trade seems certain. Expansion of exports of such goods tends to increase buying power for wage earners in American factories, making them better customers for the products of American farms. There is a high correlation between factory pay rolls and farm income.

"In making concessions to Canada on farm products, care has been taken to avoid the possibility of material hardship to any important group of producers in the United States. Imports of several of the agricultural items are necessary to supplement inadequate domestic production. As regards many more articles the imports, even if they should increase considerably under the reduced duties, cannot become more than a small percentage of United States consumption. For several major articles the quantity of imports entitled to enter at the reduced duties is limited, any excess being subject to the full rates of duty."

Under these circumstances, the document states as follows, with respect to the pork provision modification:

"No concessions on hogs and pork products were made in the 1936 agreement. In the new agreement the duties on live hogs and on fresh or chilled pork have been reduced by 50 percent, and the rate on certain cured pork has been reduced from 3¼ to 2 cents per pound. The

United States is normally a large exporter of pork products. Drought conditions during recent years had caused exports to fall off and imports to enter in larger quantities, though imports at their peak constituted only about 1 percent of consumption. In 1938 the trade situation has been changing back to normal. The concession on cured pork does not apply to canned pork and sausage, which made up the greater part of the imports during the recent period of domestic shortage. Reciprocal concessions on pork products have been made by Canada in this agreement." [Pp. 47, 48.]

There is published in exhibit 3, appendix III, a "Detailed Analysis of Individual Concessions Granted to Canada on Imports into the United States" in the 1939 trade agreement. That section of this exhibit which deals with the concession as to "bacon, hams, and shoulders, and other pork, prepared or preserved, not cooked, boned, canned, or made into sausage (par. 703)" reads as follows:

"Prior to 1934 Canada was regularly the principal supplier of relatively small imports of bacon, hams, and shoulders. During the period of domestic shortage following 1934 Poland became the chief foreign supplier, particularly of boiled canned hams. *The new classification*, on which the duty is reduced from 3¼ to 2 cents per pound, *is limited to the types of cured pork of which Canada is the principal supplier; it excludes canned products and sausage.* Imports are known to be very small compared with domestic production. Exports of bacon, hams, and shoulders, both to Canada and to other countries, usually exceed imports by a wide margin; and exports of other prepared or preserved pork, including canned pork, also greatly exceed imports." [P. 75.] [Italics supplied.]

That the intention of the negotiators was to effect reciprocal concessions, is affirmed by the President in his proclamation (T.D. 49752) of the 1939 trade agreement, reciting (p. 238) from the preamble to the agreement that the parties:

"Desiring to facilitate and extend still further the commercial relations existing between the United States of America and Canada by granting reciprocal concessions and advantages for the promotion of trade;"

have agreed to the articles set forth in the trade agreement.

There is also in evidence, bearing somewhat on the intention of the Canadian Government in negotiating reciprocal concessions in the trade agreement of November 17, 1938, with the United States, a press release that is certified by the Under-Secretary of State for External Affairs of the Department of External Affairs of Canada. (Exhibit 4.) This release, a printed document of 43 pages, was issued by the "Government of Canada on November 17th, 1938," according to the Under-Secretary's certificate. It is contemporaneous with the signing of the trade agreement.

Exhibit 4 summarizes the United States concessions to Canada, presumably as the Canadian negotiators understood these concessions. Included is the following (p. 10) as to hog products:

"Maximum reductions in the duties on swine and fresh or chilled pork *and a reduction from 3¼ to 2 cents per pound in the duty on bacon and other prepared or preserved pork, including pickled or salted pork.*" [Italics supplied.]

In the statement of "Concessions on Agricultural Products" in exhibit 4 (p. 15), there appears the following:

"The concessions in the new Trade Agreement embrace a wide range of agricultural products and include reductions in United States duties on such important articles as live cattle, swine, pork, bacon * * *."

Detailing more specifically the reductions in United States duty on "swine, pork, bacon," the statement continues (pp. 15, 16):

"Hog Products. The 1935 Trade Agreement contained no concessions on hogs or hog products. The new Trade Agreement will reduce by 50 per cent the United States duties on swine to 1 cent per pound and on pork, fresh or chilled, but not frozen, to 1¼ cents per pound. *A concession is also granted on bacon and other prepared or preserved pork, except canned hams and sausages*, whereby the duty is reduced from 3¼ cents to 2 cents per pound. This will not only benefit the trade which Canadian packers have developed in high-priced bacon, but will also promote exports to the United States of pickled and salted pork, when market conditions warrant a larger sale of this product."
[Italics supplied.]

There is in evidence (exhibit 5) **a** printed memorandum (64 pages) of the Canadian Commissioner of Customs, dated at Ottawa on November 18, 1938, in which schedule I lists the modified duty rates applicable on and after January 1, 1939, to articles the growth, produce, or manufacture of the United States, imported into Canada, and schedule II lists the modified duty rates applicable on and after January 1, 1939, to articles the growth, produce, or manufacture of Canada, imported into the United States. The modification of paragraph 703 of the United States act is, of course, as already recited in this opinion. The language of modification of Canadian tariff items, recited in schedule I, has little or no bearing on our problem of construction of the paragraph 703 modification.

While it is not in evidence, the court may take judicial notice of the 4-volume study of the United States Tariff Commission, published in 1938 and entitled "Second Trade Agreement between the United States and Canada." This study not only digests the provisions of

the new trade agreement, but it also contains data which were made available by the Tariff Commission to those interdepartmental committees who negotiated with the Canadians.

Under the heading "Schedule 7, Agricultural Products and Provisions," the Tariff Commission study (vol. III, part 1) contains several pages of data and statistics. (Pp. 7–25 to 7–31, inclusive.)

The general statement (p. 7–25) announces:

"This digest deals with cured pork products. By 'cured' is meant any process used to preserve the product. * * * Cured products of pork are classified in import statistics as 'hams, shoulders, and bacon' and 'pickled, salted, and other'. Canned pork, with the exception of canned hams which are reported as hams, and pork sausages are included under the latter classification. Under export statistics cured products of pork are classified as 'hams and shoulders', 'bacon', 'Wiltshire and Cumberland sides', 'other pork, pickled and salted', and 'canned pork'. Pork sausages are not reported separately. * * * "

The description and uses of ham, shoulders, bacon, and other cured pork products, as set forth in the study of the Tariff Commission (pp. 7–25, 7–26), may throw some light on what our negotiators had in mind.

"Description and uses

"Hams.—Some hams are sold as fresh, chilled, or frozen, but more are sold with some degree of cure, subsequently to be further processed. Many are smoked, many are cooked and some are canned by the first processors. When canned, they are boned, seasoned, and cooked, usually in a way particularly characteristic of the country of origin.

"Shoulders.—Shoulders may be sold as a complete cut or they may be cut up into three parts. When

divided, the resulting cuts are called (1) picnic shoulder, which is the lower end of the shoulder, (2) picnic or Boston butt, which is very often boned and rolled and is the upper part of the shoulder, and (3) clear plate, which is a layer of fat from the upper part of the shoulder and which is sold as a fat cut containing the blade bone if the butt is made boneless.

"Bacon.—Bacon is a loosely used term. Bacon may mean Wiltshire sides (entire side of hog carcass), Cumberland side (same as Wiltshire except the ham is removed), middle, and bellies. It is the last that is implied when the term bacon is used in this country. For the most part, bacon sold on the world market is leaner and milder of cure than the bulk of that sold in this country. Bacon imported into this country is largely of the leaner type, which has a particular appeal to a limited number of consumers in the United States.

"Other cured pork products.— Products included in this classification consist chiefly of pork sausages. As in the case of hams and bacon, the sausage coming into this country is prepared in a manner peculiar to the country of origin. Also included in this classification are pickled pigs' feet, headcheese, blood pudding, and other types of cured pork products. * * *"

When the representatives of the United States entered into the GATT negotiations, they were equipped with digests that had been prepared by the Tariff Commission for their use in connection with trade agreement negotiations. Volume VII of these digests, part I, dated November 1946, is entitled "Agricultural Products and Provisions." At page 26, this digest states:

"The reduction in duty by the trade agreement with Canada, effective January 1, 1939, did not apply to pork if cooked, boned, canned, or made into sausages, which had constituted the bulk of the imports of cured pork in the years immediately preceding. Total imports of prepared or preserved pork were considerably smaller in 1939 than in 1938, the decline being attributable partly to the recovery of pork production in the United States, and partly to the disturbed political and economic conditions in Poland and other European countries. Since imports of prepared and preserved pork, not cooked, boned, canned, etc., were not distinguished before 1939, it is impossible to tell precisely what was the effect on imports of the reduction in the duty on such pork. However, the great bulk of the imports of cured pork from Canada in all years has consisted chiefly of pork not cooked, boned, *canned*, etc. Imports from Canada were considerably smaller in 1939 than in 1938 and much smaller than in 1937, when United States production had been abnormally reduced by the drought of 1936.

"It is improbable that Poland or other European countries will for several years to come be in position to export appreciable quantities of pork products to the United States, whatever the rate of duty. Moreover, *the duty on canned pork*, the principal form in which the European pork was exported to the United States before the war, *is not a subject for negotiation*.

"In normal times Canada is the only important source of imports of cured pork, not cooked, boned, *canned*, etc., although in certain years when production in the United States was abnormally low, appreciable quantities have entered from Argentina." [Italics supplied.]

While the duty on *canned pork* was not a subject for GATT negotiations, there is nothing to indicate any such restraint as to any other merchandise under that part of paragraph 703 hav-

ing to do with "bacon, hams, and shoulders, and other pork, prepared or preserved." In this context, the negotiators made but one change in the modification that had become effective in 1939 under the Canadian Trade Agreement. They inserted the new words "including any of the foregoing if," so that the modification (T.D. 51802) reads as follows:

> "Bacon, hams, and shoulders, and other pork, prepared or preserved, but not *including any of the foregoing if* cooked, boned, packed in air-tight containers, or made into sausages of any kind.........2¢ per lb."
> [Italics supplied.]

We have set forth the terms and history of the GATT modification with some particularity and at length. Referring now to the standards for interpretation set up by Mr. Justice Frankfurter in the Shirey case, supra, we ask: Is the purpose of the quoted GATT provision "manifest"?

The language that was newly added by GATT to the language of the prior Canadian Trade Agreement modification guides us in interpretation. The GATT negotiators clearly said that it was their intention that the GATT exclusionary provision should be applied alike to bacon, hams, shoulders, and other pork, prepared or preserved. That was not so clearly stated in the Canadian Trade Agreement. The GATT modification, as to the exclusionary provision, applies to "any of the foregoing" enumerated articles, namely, bacon, hams, shoulders, and other pork, prepared or preserved.

▮▮ We are not permitted to ignore *any* of the words Congress uses to express its intention; and the same rule of interpretation governs our construction of those statutory modifications made by Presidential proclamation pursuant to congressional authority. We should give effect to all of the language used. "No rule of statutory construction has been more definitely stated or more often repeated than the cardinal rule that 'significance and effect shall, if possible, be accorded to every word.' " Ex parte Public National Bank of New York, 278 U.S. 101, 104, 49 S.Ct. 43, 44, 73 L.Ed. 202.

The GATT modification of paragraph 703 is to be read, as to the first of the enumerated articles, bacon, in substance as follows:

> "Bacon * * * but not including bacon which is cooked, boned, packed in air-tight containers, or made into sausages of any kind."

Hams, likewise, are given the benefit of the rate reduction, but not if cooked, boned, packed in airtight containers, or made into sausages of any kind. As to shoulders, there is the same limitation. "Other pork, prepared or preserved" similarly takes the modified rate, but not if the pork is "cooked, boned, packed in air-tight containers, or made into sausages of any kind."

There is no issue, in either protest, as to sausages. There is no issue as to cooking. The merchandise, in both protests, has been boned. The merchandise of one protest, the boned bacon of protest 321367–K, may or may not be packed in airtight containers. That issue of fact is in dispute. The merchandise of the other protest, 257669–K, is conceded to be boned pork (prepared or preserved), which is not packed in airtight containers.

Defendant urges, as to the bacon of protest 321367–K, that we ought to construe the commas of the GATT modification in a disjunctive context, but omitting one of the disjunctives, as if the exclusionary provision read: "Bacon, including bacon that is boned, but not including bacon that is cooked or packed in air-tight containers." Defendant's justification for this violent treatment of language simmers down to this: Every one knows that all bacon is boned and, therefore, the GATT negotiators knew it, too. It would, defendant argues, void the bacon reduction entirely to apply the disjunctive construction for which defendant argues, in its entirety,

to bacon. Hence, defendant urges on us a construction tantamount to major semantics surgery, in order to give to the commas the disjunctive interpretation on which defendant relies.

This position in which defendant finds itself as to bacon, would be avoided by the conjunctive interpretation of the GATT commas, for which plaintiff argues. Agreeing that all bacon is boned and that the GATT negotiators must be presumed to have known this, plaintiff argues that every word used will be given meaning if the GATT modification, as to bacon, is interpreted as follows:

> "Bacon * * * but not including bacon which is cooked and boned and packed in airtight containers * * *"

It appears there is such bacon known to commerce, packed in cans, but this is not the bacon of protest 321367–K.

▆ We are of opinion that the construction for which plaintiff argues is the proper one. We are reluctant to adopt any construction which ignores some of the language used by the negotiators or which imposes a different standard of exclusion from the benefits of rate reduction for one, as against another, of the enumerated articles. The interpretation for which plaintiff argues applies equally to the bacon of protest 321367–K and to the pork of protest 257669–K. The interpretation for which defendant argues would impose different standards as to the two articles. We find no evidence that the negotiators intended a difference. Indeed, we are of opinion that they intended no difference.

The history of the negotiations is not particularly helpful, one way or another. Such data as are available tend, however, to support our view of the intention of the negotiators.

Our ruling on the law makes it unnecessary for us to decide whether the plastic wrapper, in which the bacon of protest 321367–K was packed, is or is not an airtight container in the tariff sense. It is well known that there are newly developed techniques of packaging which are, in fact, airtight. We see no reason to assume that only cans are airtight containers.

It appearing from the facts of record that neither the bacon of protest 321367–K nor the pork of protest 257669–K is cooked and boned and packed in an airtight container, the merchandise is entitled to the benefit of the GATT rate reduction, as plaintiff claims.

To the extent indicated, the protests are sustained. In all other respects and as to all other merchandise, the protests are overruled. Judgment will be entered accordingly.