**UNITED STATES of America,**
**Appellee,**

v.

**CASSARO, INC., and Salvatore Cassaro,**
**Defendants, Appellants.**

**No. 7791.**

United States Court of Appeals,
First Circuit.

Heard April 5, 1971.

Decided May 10, 1971.

---

**154**

Arthur A. Karp, Boston, Mass., for defendants-appellants.

Paul F. Ware, Jr., Asst. U. S. Atty., with whom Herbert F. Travers, Jr., U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Defendants Cassaro, Inc., and Salvatore Cassaro were convicted by a jury of violating 21 U.S.C. § 331(k) of the Federal Food, Drug and Cosmetic Act.[1] Cassaro, Inc., owns the Cassaro Bakery located in Medford, Massachusetts, and Salvatore Cassaro has overall responsibility for its management. On February 26, 1970, a federal food and drug inspector discovered insects, insect webbing, larvae, and insect trails in flour in the bakery's flour conveyor system. During the course of the inspection he also observed a beetle-type insect in a scale pan used for weighing various ingredients, static flour dust and dirt on lighting fixtures, unshielded lights, employees without head coverings, and flour being poured from bags from which warehouse dust and other matter had not been removed. The indictment charged that defendants

---

1. 21 U.S.C. § 331 provides in relevant part:

"The following acts and the causing thereof are prohibited:

"(k) The * * * doing of any * * * act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

Section 333(a) makes it a misdemeanor to violate any of the provisions of § 331. The maximum penalty for a first offense is imprisonment for one year or a $1,000 fine, or both; for subsequent offenses, three years or $10,000, or both. Since this was not the first offense, Cassaro, Inc., and Salvatore Cassaro were fined $2,000 and $500 respectively, and Salvatore was placed on probation for two years.

"on or about February 23, 1970 [did] receive at Medford, Massachusetts, quantities of flour, a food, which * * * had been shipped in interstate commerce from Grand Forks, North Dakota, * * * [and that] while said food was held for sale after shipment in interstate commerce, * * * the said defendants did * * * cause said food to be exposed to contamination by insects, by causing said food to be placed in insect-contaminated flour conveying equipment * * * [which] resulted in said food being adulterated within the meaning of 21 U.S.C. 342(a) (3) * * * [and] 21 U.S.C. 342(a) (4)." [2]

■ Defendants contend that they are not guilty under the statute because they were not holding the flour for sale, *i. e.*, they were in the business of selling bread and rolls, not flour. When faced with similar problems of statutory interpretation under the Food, Drug and Cosmetic Act, the Supreme Court has consistently accorded the statute a broad construction, *e. g.*, United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964) (a mere bailee may be guilty under the Act); Kordel v. United States, 335 U.S. 345, 348–350, 69 S.Ct. 106, 93 L.Ed. 52 (1948) (information pamphlets about a drug that were sold separately from the drug they described, held to be "labels"

within the meaning of the Act); United States v. Sullivan, 332 U.S. 689, 696–697, 68 S.Ct. 331, 92 L.Ed. 297 (1948) (retailer who purchased drugs from wholesaler in his own state may be guilty under the Act when wholesaler purchased drugs in interstate commerce).[3]

The legislative history, the language of the statute itself, and judicial interpretation of similar language in a prior statute all suggest that § 331(k) was intended to apply to the defendants. The legislative history reveals that § 331(k) was designed to protect the channels of interstate commerce by maintaining the integrity of the products in question "up to the time of purchase by the ultimate consumer." 1948 U.S.Code Cong.Service, pp. 2119, 2122.[4] Congress reasoned that the adulteration of goods that had been shipped in interstate commerce would lead to consumer dissatisfaction and lack of confidence in those goods, thereby depressing the demand for out-of-state products and making it difficult for out-of-state manufacturers to market them. The knowledge that local bread and rolls have been made with contaminated interstate flour would presumably depress the demand for interstate flour in a similar manner. The statute defines "food" to include not only "articles used for food or drink" but also "articles used for *components* of any such article." 21 U.S.C. § 321(f) (emphasis added).[5] A similar provision in the

---

2. 21 U.S.C. § 342 provides in relevant part:

"A food shall be deemed to be adulterated—

"(a) * * * (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; or (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health; * * *."

3. *Sullivan* was decided before Congress amended the statute to add the words, "(whether or not the first sale)." The original purpose of that amendment was to reverse the Fifth Circuit's ruling in

the *Sullivan* case, and its sponsors declined to withdraw it after the Supreme Court decision was handed down. 1948 U.S.Code Cong.Service, pp. 2127–28.

4. The Senate Report that appears in 1948 U.S.Code Cong.Service deals with the 1948 amendments to the Food, Drug and Cosmetic Act. Section 331(k) predates those amendments. Their legislative history is relevant, however, because they were passed to authorize the *seizure* of adulterated products during the same period as that covered by § 331(k), *i. e.*, while the products are being held for sale after shipment in interstate commerce.

5. The cases on which defendants rely for the proposition that the term "flour" is too general to be considered a "food" under the Act are inapposite. United States

Pure Food and Drug Act of 1906 dealing with "any article of food * * *, having been transported from one State to another *for sale*" (emphasis added) was interpreted by the Supreme Court to cover eggs purchased by a baker solely for the purpose of making cookies and cakes. The Court held that this language covered "[a]ll articles, compound or single not intended for consumption by the producer." Hipolite Egg Co. v. United States, 220 U.S. 45, 54, 31 S.Ct. 364, 366, 55 L.Ed. 364 (1911). For a similar construction under the present Act, *see United States v. 1,800.2625 Wine Gallons*, 121 F.Supp. 735 (W.D.Mo.1954).

■ Defendants contend alternatively that they cannot be prosecuted under the federal statute because their flour was no longer "in" interstate commerce at the time it became adulterated. In Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L. Ed. 1570 (1935), defendants were prosecuted for violating regulations placed on the poultry industry in the New York City area under the authority of the National Industrial Recovery Act. Although most of the poultry had been received from out-of-state, the Court held these regulations invalid on the ground that they sought to govern purely local transactions. But in United States v. Sullivan, *supra,* the Court held that interstate commerce in drugs continued even *after* the first purely intrastate sale. The test is not the location of the individual transaction that the government is seeking to regulate but the overall purpose of the regulatory scheme. In *Schechter* the Court stressed that the poultry regulations did not govern *any* interstate transaction; they did not *begin* to govern until after the last interstate sale had been completed. 295 U.S. at 542–543, 55 S.Ct. 837. Section

331(k), on the other hand, is but one element of an overall scheme designed to regulate the interstate flow of goods "from the moment of their introduction into interstate commerce" until "the moment of their delivery to the ultimate consumer." United States v. Sullivan, *supra,* 332 U.S. at 696, 68 S.Ct. at 336. It is by this time well established that,

> "[a]lthough activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937).

*Accord,* Heart of Atlanta Motel v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

■ Defendants' contention that flour beetles cannot be considered "filth" under § 342, *see* note 2 *supra,* is wholly without merit. Insects and larvae fragments have been held to constitute "filth" in numerous cases, *e. g.,* Golden Grain Macaroni Co. v. United States, 209 F.2d 166, 167–168 (9th Cir. 1953). "Congress intended that the word 'filthy', as used in the Act, should be construed to have its usual and ordinary meaning." United States v. Swift & Co., 53 F.Supp. 1018, 1020 (M.D.Ga. 1943). In light of the legislative history discussed *supra,* we see no reason to read into the statute a requirement that the adulteration be proven injurious to health; consumers have no more desire to eat insect fragments—no matter how harmless—than any other foreign matter. *Cf.* United States v. 133 Cases of Tomato Paste, 22 F.Supp. 515 (E.D.Pa. 1938). Nor did the government have to

v. Krumm, 269 F. 848 (E.D.Pa.1921), held that the term "a product *prepared* from flour" was too vague. "Flour" is not a "generic" term any more than "bread" or "cheese," *cf.* Commonwealth v. Chase, 125 Mass. 202 (1878), and the

indictment was clearly specific enough to apprise defendants of the allegations they had to prepare to meet. Russell v. United States, 369 U.S. 749, 763, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

prove that a foreign substance was actually found in defendants' bread and rolls since the statute requires only that a "component" thereof be adulterated. 21 U.S.C. § 321(f).

The testimony concerning unsanitary conditions in the area adjacent to the flour conveying system was directly relevant to the charge in the indictment. Although the indictment focused specifically on contamination in the flour conveying equipment, unsanitary conditions in the adjacent area could reasonably be expected to contribute to and increase the likelihood of contamination in the equipment itself. *See* 21 U.S.C. § 342 (a) (4).

■ Salvatore Cassaro argues that he cannot be found guilty individually because he was out sick at the time the food and drug officer made his inspection. At trial Salvatore testified that, when he is not present at the bakery, his brother Peter is in charge. However, the food and drug officer testified that, when he asked Salvatore why Peter had failed to appear at an administrative hearing on this matter, Salvatore answered that "he, Salvatore, had full responsibility for operations." "The offense is committed * * * by all who * * * [have] a responsible share in the furtherance of the transactions which the statute outlaws." United States v. Dotterweich, 320 U.S. 277, 284, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943). *Accord,* Lelles v. United States, 241 F.2d 21, 24 (9th Cir.), cert. denied, 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957).

■ Finally, defendants argue that the government failed to prove at trial that it had furnished them with a copy of the results of the analysis of a sample of flour the investigator had obtained during his inspection. *See* 21 U.S.C. § 374(d). Defendants have never alleged that they did not in fact receive a copy of these results and conceded at oral argument that this issue was never raised below. Although they had a right to receive a copy under the statute, the government's failure to furnish one is rele-

vant here only to the extent that defendants' ability "to make a complete defense" was prejudiced thereby. Triangle Candy Co. v. United States, 144 F.2d 195, 199 (9th Cir. 1944). Since defendants never moved for its production below, we can only conclude either that they had in fact received it or that they had decided that they did not need it for their defense.

Affirmed.