UNITED STATES of America,
Plaintiff-Appellee,

v.

H. B. GREGORY CO., a corporation, and
James H. Gregory, an individual, Defendants-Appellants.

No. 73–1744.

United States Court of Appeals
Seventh Circuit.

Argued Dec. 6, 1973.

Decided March 14, 1974.

Rehearing Denied June 27, 1974.

William J. Campbell, Senior District Judge, concurred in part and dissented in part, with opinion.

Henry C. Friend, Milwaukee, Wis., for defendants-appellants.

David B. Bukey, U. S. Atty., Milwaukee, Wis., Joanne S. Sisk, Chief, Office of Gen. Counsel, Dept. of Health, Education & Welfare, Rockville, Md., Gregory B. Hovendon, Daniel M. Clements, Anti-Trust, Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before HASTINGS and KILEY, Senior Circuit Judges, and CAMPBELL, Senior District Judge.*

HASTINGS, Senior Circuit Judge.

This appeal is concerned with alleged violations of the Federal Food, Drug, and Cosmetic Act, Title 21, U.S.C. § 301 et seq. (the Act), and, specifically, of 21 U.S.C. § 331(k).

A four-count information was filed December 22, 1972, naming as defendants, H. B. Gregory Co., a Wisconsin corporation, and James H. Gregory, its president and treasurer, individually. The Gregory Company operated a bakery supply warehouse and supplied therefrom ingredients to bakeries throughout the Milwaukee metropolitan area. Mr. Gregory had personal responsibility for all operations of the warehouse.

The information charged defendants with violating § 331(k) [1] for having

---

* Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

1. § 331. Prohibited acts
   The following acts and the causing thereof are prohibited:
   *       *       *       *       *
   (k) The alteration, mutilation, destruction, obliteration, or removal of the whole or any

part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

caused four lots of food, *i. e.*, corn meal (Count I), poppy seed (Count II), caraway seed (Count III), and corn grits (Count IV), to become adulterated while these foods were held for sale at the Gregory warehouse after shipment in interstate commerce.

Two separate specifications of adulteration were alleged: (1) that the food in all four counts was adulterated within the meaning of 21 U.S.C. § 342(a)(4),[2] in that it was held under insanitary conditions whereby it may have become contaminated with filth; and (2) that the corn meal in Count I was adulterated within the meaning of 21 U.S.C. § 342(a)(3),[3] in that it consisted in part of a filthy substance by reason of the presence in the corn meal of rodent excreta pellets.

The case was tried to the court, without the intervention of a jury, the Honorable Myron L. Gordon, District Judge presiding. There was little dispute about the basic evidentiary facts. The trial court found each defendant guilty on all four counts and entered judgment accordingly. Subsequently, the court sentenced the Gregory Company to pay a fine of $1,000 on each of the four counts, a total of $4,000, and sentenced Mr. Gregory to pay a fine of $500 on each of the four counts, a total of $2,000. There was no sentence of imprisonment as to Mr. Gregory. Thereafter, the court denied defendants' petitions for a reduction and modification of these sentences. This appeal followed.

A concise statement of the issues raised on this appeal follows: (1) whether the Government proved its case against each defendant beyond a reasonable doubt; (2) whether the trial court erred in imposing fines on each defendant on each of the four counts; and (3) whether the trial court abused its discretion in denying defendants' petitions for reduction or modification of the sentences.

We have read the entire transcript of the evidence introduced in this trial, as well as the record of the proceedings before Judge Gordon. It should be noted at the outset that the trial court rejected an offer of the corporate defendant, Gregory Company, to change its plea from not guilty to guilty for the reason that its codefendant elected not to permit any corporate officer to waive his Fifth Amendment privilege for the purpose of testifying that there was corporate authority to do so. The court properly honored this privilege and as a result was compelled to reject the corporate offer. The Government put on its case with employees of the United States Food and Drug Administration (FDA) in one day and rested. The defendants, having cross-examined such witnesses, rested without introducing any evidence. It is on this state of the record that this appeal is submitted for our consideration.

## INTERSTATE SHIPMENT OF FOOD

It is beyond dispute that as to Count I the defendant Gregory Company received a number of bags of corn meal on or about March 14, 1972, which had been manufactured by Evans Milling Co., Inc., and shipped by it in interstate commerce from Indianapolis, Indiana. The bags were each labeled as containing 100 pounds net EMCO degerminated yellow snack meal. They were held for sale in the Gregory Company warehouse until at least on or about March 22, 1972.

Similarly, as to Count II the defendant Company received a number of bags of poppy seed, and as to Count III, a number of bags of caraway seed, on or

2. § 342. Adulterated food
   A food shall be deemed to be adulterated—
   (a) * * * (4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health; * * *.

3. § 342. Adulterated food
   A food shall be deemed to be adulterated—
   (a) * * * (3) if it consists in whole or in part of any filthy, putrid, or decomposed substance, or if it is otherwise unfit for food; * * *.

about March 8, 1972. These two shipments were products of The Netherlands and were shipped in interstate commerce from New York, New York, by Transit Trading Company. The bags were each labeled as containing 109 pounds net of the respective products, ·and were held for sale in the Gregory warehouse until at least on or about March 21, 1972.

Finally, as to Count IV the defendant Company received a number of bags of corn grits on or about February 21, 1972, which had been manufactured by Evans Milling Co., Inc., and shipped by it in interstate commerce from Indianapolis, Indiana. The bags were each labeled as containing 100 pounds net EMCO degerminated special grits, and were held for sale in the Gregory Company warehouse until at least on or about March 22, 1972.

### EVIDENCE RELATING TO ADULTERATION

FDA Inspector Robert G. Brett, Jr., was assigned to inspect the Gregory warehouse. After testifying in support of the interstate shipment of the four lots of food in question, he testified in detail about his inspection of the warehouse covering a five-day period of March 20–24, 1972. Without relating here this detailed step by step inspection and its results, it is sufficient to state that, as to the lot of corn meal specified in Count I, in addition to rodent excreta pellets and a rodent urine stain on the bag material, the inspector found a rodent gnawed hole in one of the bags, two rodent excreta pellets in the corn meal itself inside the bag, and at least 60 rodent excreta pellets in corn meal which had spilled from the hole onto the warehouse floor. Inspector Brett further stated that, as to the lots of poppy seed, caraway seed and corn grits specified in Counts II, III and IV, he found on the bag material surfaces numerous rodent excreta pellets and multiple rodent urine stains, as well as numerous rodent excreta pellets on the floor beneath the bags. He also testified that he observed other general insanitary conditions throughout the warehouse during his inspection. He found that 75 percent of the small rodent traps in the warehouse were unbaited. He observed various potential rodent entryways in the areas of the receiving and shipping dock and the boiler room. Brett reported a ɪodent entry in the shelving behind the lot of adulterated corn meal above referred to, rodent tracks in the spilled corn meal from this lot, and a rodent burrow in the enclosure of the warehouse syrup tank.

Inspector Brett testified that he collected samples of the rodent excreta pellets, urine stains and food in the several lots. FDA Analytical Chemists Trauba, Carlson, Melchior, Palmer and Netz each testified that their respective analyses of the samples Inspector Brett collected confirmed that they consisted of rodent excreta pellets and rodent urine stains.

As above stated, the corn meal found in one bag was actually shown to be unfit for human consumption. No such showing was made as to the other lots of food.

Inspector Brett took numerous photographs of the warehouse area and the various lots of food he inspected depicting the conditions he found during the five-day period. These photographs were introduced and received in evidence.

### EVIDENCE RELATING TO MR. GREGORY

Inspector Brett testified that when he first arrived at the warehouse he inquired of the bookkeeper for Mr. Gregory. Upon learning that he was not in, Inspector Brett identified himself and was given permission to enter the warehouse. He first saw Mr. Gregory on the third day of his inspection when Mr. Gregory observed him taking photographs and inquired what he was doing. A brief conversation ensued concerning the bad condition of some shelving being photographed. At the conclusion of the fifth day of the inspection, Inspector Brett made an appointment with Mr. Gregory and gave him a list of the samples he had collected and the insanitary

conditions he had found during his inspection.

In the course of this conversation, Inspector Brett stated that Mr. Gregory said he was president and treasurer of the H. B. Gregory Company; that he was in charge of the sanitation program and specifically the rodent control program in the warehouse; and that he was there on a daily basis. Further, Inspector Brett observed during his inspection that Mr. Gregory was giving the employees directions concerning where to store lots of food materials and was giving directions to load out trucks to his customers. The only other persons he observed employed at the warehouse were the bookeeper and two warehouse employees. One of the two warehouse employees was working in the syrup area and the other was engaged in receiving and shipping food materials.

Inspector Brett testified that during this final conference Mr. Gregory did not question his findings which he submitted in writing. Mr. Gregory did say that he felt the building was too old to be made rodent proof; he discussed two new "wind up" mouse traps he was purchasing; and he asked for any suggestions Inspector Brett might have concerning the rodent problem within the warehouse. The inspector declined to make any such suggestions because of his lack of qualifications but did propose a different manner of storing the food materials. Mr. Gregory responded that the warehouse was too small to make the suggested storage changes.

## I.

■ It is common knowledge, of which the court may take judicial notice, that the four lots of food at issue are foods within the meaning of the Act, 21 U.S.C. § 321(f).[4] *Cf.* United States v. O. F. Bayer & Co., 2 Cir., 188 F.2d 555, 557 (1951). It is well established that "[a]*ll articles,* compound or single, *not*

*intended for consumption by the producer, are designed for sale,* and because they are, it is the concern of the law to have them pure." Hipolite Egg Co. v. United States, 220 U.S. 45, 54, 31 S.Ct. 364, 366, 55 L.Ed. 364 (1911) (emphasis added). *Accord,* United States v. Kocmond, 7 Cir., 200 F.2d 370, 372–373 (1952), cert. denied, 345 U.S. 924, 73 S. Ct. 782, 97 L.Ed. 1355 (1953); United States v. Cassaro, Inc., 1 Cir., 443 F.2d 153, 155–156 (1971). It has been held that the purpose of § 331(k), *supra,* is "to safeguard the consumer from the time the food is introduced into the channels of interstate commerce to the point that it is delivered to the ultimate consumer * * *." United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 92, 84 S.Ct. 559, 563, 11 L.Ed.2d 536 (1964), citing *Kocmond, supra,* 200 F.2d at 372.

■ These holdings should lay to rest defendants' argument that the lots of food were not held for sale because (1) the one lot of corn meal was so filthy it was no more than "garbage" and would not be offered for sale under any conditions, and (2) the contaminated outer surfaces of the bags of the other foods would be discarded and the otherwise wholesome contents would be repacked.

■ The oft cited case of Berger v. United States, 8 Cir., 200 F.2d 818 (1952), lays down the definitive "reasonable possibility" test now generally accepted in cases involving adulterated food under § 342(a)(4), *supra,* wherein the court, at 821, states:

It is clear that the congressional intent is to make it a criminal offense for a person to * * * hold food under such insanitary conditions that it *may* become contaminated. *It is not necessary that it actually become contaminated.* [Emphasis added.] * * * [T]he statute is designed to prevent adulterations "in their incipiency" by condemning insanitary

---

4. § 321. Definitions; generally
   For the purposes of this chapter—
   \*      \*      \*      \*      \*

(f) The term "food" means (1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article.

conditions which *may* result in contamination. [Emphasis by the court.]

\* \* \* The condition condemned by the statute, which must be proved to support a conviction, is one which would with *reasonable possibility* result in contamination. [Emphasis added.]

In *Wiesenfeld, supra,* 376 U.S. at 91–92, 84 S.Ct. at 564, the Court explicitly declares that § 331(k) prohibits any act which results in adulteration of the product, and that food is adulterated if it has been held "under insanitary conditions whereby it *may* have become contaminated with filth." (Emphasis added.)

It becomes readily apparent that, under the standards above outlined, there was sufficient evidence to warrant the trial court in finding beyond a reasonable doubt (1) that the insanitary conditions found in the Gregory warehouse were such that there was a reasonable possibility that the four lots of food might become contaminated with rodent filth; and (2) that the corn meal in Count I was actually contaminated with rodent filth.

We hold, therefore, that the Government proved beyond a reasonable doubt that the defendants violated the Act as alleged in the information.

## II.

Pursuant to the standards of criminal liability for violations of the Act set out in United States v. Dotterweich, 320 U. S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), the trial court held that Mr. Gregory was a person in a position of sufficient authority and responsibility in the conduct of the business of the Gregory corporation to be held personally and strictly liable for violations of the Act committed in the course of such corporate business.

Judge Gordon expressly rejected Mr. Gregory's contention that this standard was the improper legal criterion for measuring his personal liability for the violations. Mr. Gregory seeks to under-

mine the *Dotterweich* standards and cites certain state court cases and scholarly writings challenging the lack of a *scienter* requirement in criminal cases, and here in particular because the standard fails to require a causal relation between the individual and the violation of the Act.

*Dotterweich* has been cited and reviewed many times. It was a divided opinion (5 to 4) by the Supreme Court, Mr. Justice Frankfurter writing for the majority and Mr. Justice Murphy for the minority. The fact that it was a drug case rather than a food case is not a proper distinguishing factor. United States v. Dianovin Pharmaceuticals, Inc., 1 Cir., 475 F.2d 100, 103, cert. denied, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 65 (1973). At this point it is sufficient to quote the *Dotterweich* majority, 320 U.S. at pages 280–281, 64 S.Ct. at page 136:

The prosecution to which Dotterweich was subjected is based on a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger. United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604. And so it is clear that shipments like those now in issue are "punished by the statute if the article is misbranded [or adulterated], and that the article may be misbranded [or adulterated] without any conscious fraud at all. It was natural enough to throw this risk on shippers with regard to the identity of their wares . . . " United States v. Johnson, 221 U.S. 488, 497–498, 31 S. Ct. 627, 55 L.Ed. 823.

And quoting further, at pages 284–285, 64 S.Ct. at page 138:

Whether an accused shares responsibility in the business process resulting in unlawful distribution depends on the evidence produced at the trial and

its submission—assuming the evidence warrants it—to the jury under appropriate guidance. The offense is committed, unless the enterprise which they are serving enjoys the immunity of a guaranty, by all who do have such a responsible share in the furtherance of the transaction which the statute outlaws, namely, to put into the stream of interstate commerce adulterated or misbranded drugs. Hardship there doubtless may be under a statute which thus penalizes the transaction though consciousness of wrongdoing be totally wanting. Balancing relative hardships, Congress has preferred to place it upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of consumers before sharing in illicit commerce, rather than to throw the hazard on the innocent public who are wholly helpless.

These standards enunciated by Mr. Chief Justice Taft for a unanimous Court in United States v. Balint, 258 U.S. 250, 254, 42 S.Ct. 301, 66 L.Ed. 604 (1922), and followed in Dotterweich, supra, 320 U.S. at 280–281, 64 S.Ct. 134, were expressly reaffirmed by the Court in a unanimous opinion by Mr. Justice Stewart in United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 91–92, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964). Numerous other federal cases are in accord. See, e. g.: United States v. Cassaro, Inc., supra, 443 F.2d at 157; Lelles v. United States, 9 Cir., 241 F.2d 21, 23–24, cert. denied, 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957); United States v. Kaadt, 7 Cir., 171 F.2d 600, 604 (1948); United States v. Parfait Powder Puff Co., 7 Cir., 163 F.2d 1008, 1009–1010 (1947), cert. denied, 332 U.S. 851, 68 S.Ct. 356, 92 L.Ed. 421 (1948).

If the Supreme Court standards of individual criminal liability announced in Balint, Dotterweich and Wiesenfeld Warehouse, supra, are to be set aside, we shall defer to the Court's collective wisdom in that area. We shall not undertake to overrule the Supreme Court.

■ Both Dotterweich and Wiesenfeld Warehouse, supra, state that an individual's claim that his actions do not factually bring him within the corporate liability standards "involves factual proof to be raised defensively at a trial on the merits." (Wiesenfeld Warehouse, 376 U.S. at 91, 84 S.Ct. at 563.) In light of Inspector Brett's testimony and Mr. Gregory's admissions of his area of responsibility and actions in the operation of the warehouse business, we find and hold that the district court did not err in convicting him of the violations of the Act.

### III.

Defendants contend that but one offense is involved in this case since the four bags of food in question were all found in the same warehouse at the same time during the same inspection.

In a petition for reduction of sentence defendants sought to have the multiple penalties of $4,000 assessed against the corporation reduced to $1,000, and the multiple penalties of $2,000 assessed against Mr. Gregory abated or, if allowed, reduced to $500.

A petition for correction or reduction of sentence may be filed pursuant to Rule 35, Federal Rules of Criminal Procedure, Title 18, U.S.C. It is well established that the grant or denial of such a petition is addressed to the sound discretion of the district court. United States v. Krueger, 9 Cir., 454 F.2d 1154, 1155 (1972); United States v. Jones, 2 Cir., 444 F.2d 89, 90 (1971).

It has been held that a four-count indictment charging defendant with receiving foods and allowing the same to become adulterated under §§ 331(k), 342(a)(3, 4) was not duplicitous where each count referred to a different food. Akin Distributors of Florida, Inc. v. United States, 5 Cir., 399 F.2d 306, 307 (1968), cert. denied, 394 U.S. 905, 89 S.Ct. 1013, 22 L.Ed.2d 216 (1969). In Robinson v. United States, 10 Cir., 366 F.2d 575, 579 (1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 717, 17 L.Ed.2d 547 (1967), it was held that separate sales of illegal drugs supported separate counts

in the indictment brought under § 331 (k), although they occurred at the same place and on the same evening. See also V. E. Irons, Inc. v. United States, 1 Cir., 244 F.2d 34, 45–46, cert. denied, 354 U.S. 923, 77 S.Ct. 1383, 1 L.Ed.2d 1437 (1957). It is to be noted that United States v. Wiesenfeld Warehouse Co., *supra,* although duplicity was not an issue, reversed the dismissal of an information similar to the one in the case at bar, where the six counts of the information differed only with respect to the particular shipment or product involved. 376 U.S. at 87, fn. 3, 84 S.Ct. 559.

Defendants cite other cases dealing with the question of duplicity in other areas of the criminal law, but none in the food and drug field. Since it was established in the instant case that each of the four counts here involved refers to a different food, three of which were received on different dates, we hold that the district court did not err in denying defendants' petition to reduce the sentence.

Finally, defendants urge that Judge Gordon abused his discretion in refusing to revise his decision that they were found guilty of "holding food under insanitary conditions," and to state that "the food examined was not tainted, but was wholesome and fit for human consumption." Defendants argue that this request should have been granted in the face of allegedly harmful newspaper publicity that defendants were "fined for tainted food." We regard this contention as not well taken since this relief was entirely within the discretion of the trial court.

In light of the foregoing, we affirm the decision and judgment of the district court in all respects.

*Affirmed.*

WILLIAM J. CAMPBELL, Senior District Judge (concurring in part and dissenting in part).

I agree that defendants were properly found to have violated Title 21 U.S.C. § 331(k) in that they "held" food for sale after shipment in interstate commerce which consisted in whole or in part of a filthy, putrid, or decomposed substance (*i. e.,* the corn meal referred to in Count I), and held food for sale after shipment in interstate commerce under unsanitary conditions whereby it may have become contaminated with filth (*i. e.,* the corn meal, poppy seed, caraway seed and corn grits referred to in Counts I, II, III and IV respectively). However, I respectfully disagree with the finding that defendants were each guilty of four separate violations of the statute.

These defendants were charged in a four-count information with holding adulterated food for sale after the interstate shipment thereof in violation of Title 21 U.S.C. § 331(k). Count I charged that corn meal was "adulterated" as that term is defined by 21 U.S.C. § 342(a)(3) and as defined by § 342(a)(4), i. e., Count I charged that the corn meal consisted in part of a "filthy, putrid or decomposed substance" [(a)(3)] and that it was "held under unsanitary conditions whereby it may have become contaminated with filth . . . ." [(a)(4)].

Counts II, III and IV charged, respectively, that poppy seed, caraway seed and corn grits were held under unsanitary conditions and were "adulterated" within the meaning of § 342(a)(4). The government neither charged nor proved that these foods actually consisted of a filthy, putrid or decomposed substance [§ 342(a)(3)].

If the government had charged and proved adulteration as defined by § 342(a)(3) as to each of the four kinds of food held for sale by the H. B. Gregory Co., I would agree that defendants may properly be found to have committed four separate violations of Title 21 U.S.C. § 331(k), and accordingly, I would not consider separate sentences as to each count improper. But where the government charges three separate offenses (Counts II, III and IV) under § 342(a)(4) because three different kinds of food are being held, and proves but *one* unsanitary condition (i. e., the unsanitary condition of the building in

which the foods are stored), I believe the maximum sentence that should be imposed is that which may be imposed for a single violation of the Act, a fine not to exceed one thousand dollars and/or imprisonment for not more than one year. 21 U.S.C. 333(a).

To hold otherwise conditions the extent of a defendant's criminal liability not only on his failure to provide a sanitary environment for the foods held for sale, but also on whether defendant has held one, ten, twenty or one hundred different *kinds* of food on the premises, irrespective of the quantity thereof. To illustrate the problem thus presented, imagine the potential liability of a supermarket manager in charge of a mice-infested store. The government's proof of this single unsanitary condition could, under the majority's view, sustain separate convictions, potentially allowing consecutive one year prison terms, for each of the hundreds of different kinds of food held for sale on the premises. At the same time, the owner of a warehouse wherein large quantities of only one kind of food are stored could not receive a sentence in excess of one year in prison, plus a fine of one thousand dollars.

To avoid the prospect that such fortuitous circumstances could distinguish the criminal liability of one defendant from that of another, I would hold that if the government chooses to prove adulteration solely on the basis of § 342(a)(4), a defendant's maintenance of an unsanitary facility within which foods are held for sale should be considered the conduct proscribed, regardless of how many different kinds of foods are stored therein, and that therefore only one sentence may be imposed.

I am not persuaded that Akin Distributors of Florida, Inc. v. United States, 399 F.2d 306 (5th Cir. 1968); Robinson v. United States, 366 F.2d 575 (10th Cir. 1966); V. E. Irons, Inc. v. United States, 244 F.2d 34 (1st Cir. 1957); or United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed. 2d 536 (1964), cited by the majority, are authority to the contrary.

In both *Robinson* and *V. E. Irons, Inc.*, defendants were charged with multiple counts of "misbranding" drugs. Neither case involved "adulteration"; neither case imposed multiple penalties on the basis of a single act or omission; neither case involved 21 U.S.C. § 342(a)(4).

The Fifth Circuit's decision in *Akin* involved both § 342(a)(3) and § 342(a)(4). The brief opinion in that case states that "appellant had received foods and allowed same to become adulterated within the meaning of Title 21 U.S.C. § 342(a)(3) and (a)(4) . . . .". 399 F.2d at 307. The opinion does not disclose whether or not a finding of guilty was sustained as to any count in which evidence showed adulteration only within the meaning of § 342(a)(4), but a reasonable inference may be drawn that the government proved adulteration under § 342(a)(3) as to each of the different kinds of foods claimed to have become contaminated. The basis for so inferring is found in the court's statement that "the evidence supporting the alleged adulteration of the food named in each count was different for each food." 399 F.2d at 307.

Finally, the *Wiesenfeld* decision dealt solely with the question of whether the act of "holding" food for sale under unsanitary conditions whereby it may become contaminated with filth constitutes a violation of § 331(k). The Court answered that question in the affirmative. Whether a defendant could be sentenced separately on the basis of each of the several kinds of food so held was not an issue in *Wiesenfeld* and was not considered by that Court.

Accordingly, I would affirm the convictions under Count I and would affirm as to Counts II, III and IV on the basis that they constitute but one offense. Consistent with this view, I would vacate two of the one thousand dollar fines imposed upon the corporate defendant, and would vacate two of the five hundred dollar fines imposed upon Mr. Gregory.