MONSANTO COMPANY,
Defendant-Appellant,

v.

Robert MILLER, Phyllis Miller, Stephen Miller, and Beverly Miller, Plaintiffs-Appellees.

No. 1–783A213.

Court of Appeals of Indiana, First District.

Oct. 26, 1983.

Michael R. Fruehwald, John J. Kish, Barnes & Thornburg, Indianapolis, for defendant-appellant.

Richard J. Wood, Mellen, Mellen & Wood, Richard D. McIntyre, Sr., McIntyre & McIntyre, Bedford, for plaintiffs-appellees.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, Monsanto Company (Monsanto), brings this interlocutory appeal following the denial of its motion to dismiss by the Greene Circuit Court in favor of plaintiffs-appellees, Robert, Phyllis, Stephen and Beverly Miller (Millers). Monsanto claims Millers' suit for damages is barred by the applicable statute of limitations.

## STATEMENT OF THE FACTS

As stated in Millers' complaint, in 1970 Bloomfield Silo Co. constructed a silo on land owned by Millers, to be used in connection with Millers' dairy farm. The inside of the concrete silo was coated with a substance known as cumar, which was found to contain polychlorinated biphenyls (PCBs). PCBs are toxic chemicals which have been determined to be undesirable for human consumption. Upon completion, the silo was used to store silage which was subsequently fed to Millers' dairy cattle.

On August 20, 1976, as a result of tests conducted by the Indiana Board of Health on August 3, Millers were notified that their herd's raw milk contained PCBs. This contamination was caused by the cows' ingestion of feed which had been stored in the PCB-coated silo. In 1977, Bloomfield Silo Co. recoated Millers' silo with a non-toxic substance in an effort to reduce the amount of PCBs in the herd's milk. However, the PCB level in the milk rose to a new high in 1978, and Bloomfield Silo Co. recoated Millers' silo again in 1980. As of 1981, following a further increase in the amount of PCBs in their raw milk, Millers' cows were no longer fed silage from the contaminated silo. On February 8, 1982, Millers were notified by the State Board of Health that the silo was going to be condemned, which condemnation officially occurred in June. Millers filed a complaint for damages on July 28, naming Bloomfield Silo Co. and Monsanto as defendants. Millers cause of action against Bloomfield Silo Co. was dismissed on January 18, 1983, pursuant to Ind.Code 34–4–20–2 (1983). Monsanto's

motion to dismiss, based on Millers' alleged failure to timely file the complaint within the applicable statute of limitations period, was denied on June 27, 1983.

## DISCUSSION AND DECISION

The sole issue presented on appeal is whether the trial court erred in failing to dismiss Millers' action against Monsanto.

Millers assert loss of the use of the PCB-coated silo as the basis for this action. The resulting reduction in the size of Millers' herd and the decrease in milk production are merely consequential damages.

▪ The applicable statute of limitations is determined by the nature or substance of the cause of action. *Shideler v. Dwyer,* (1981) Ind., 417 N.E.2d 281. Indiana's product liability law applies to "all actions brought for or on account of ... property damage caused by, or resulting from, the manufacture, construction or design of any product". Ind.Code 33–1–1.5–2. Millers' claim against Monsanto, the manufacturer of the toxic silo coating, falls within the scope of this statute. Ind.Code 33–1–1.5–5 states the time period within which a products liability action must be brought:

"This section applies to all persons regardless of minority or legal disability. Notwithstanding IC 34–1–2–5, any product liability action must be commenced within two (2) years after the cause of action accrues or within ten (10) years after the delivery of the product to the initial user or consumer; except that, if the cause of action accrues more than eight (8) years but not more than ten (10) years after that initial delivery, the action may be commenced at any time within two (2) years after the cause of action accrues."

▪ As elucidated in *Dague v. Piper Aircraft Corporation.,* (1981) Ind., 418 N.E.2d 207, suit must be brought within both ten years of delivery to the initial user and two years of the accrual date to meet the requirements of I.C. 33–1–1.5–5. However, Indiana's product liability statutes do not apply to a cause of action which accrued

before June 1, 1978. Ind.Code 33–1–1.5–8(b).

▪ In the event Millers' cause of action is determined to have accrued prior to June 1, 1978, the applicable statute of limitations would be that covering injuries to real property, Ind.Code 34–1–2–1, which reads:

"The following actions shall be commenced with six (6) years after the cause of action has accrued, and not afterwards.... For injuries to property other than personal property, damages for any detention thereof, and for recovering possession of personal property...."

Both Ind.Code 33–1–1.5–5 and Ind.Code 34–1–2–1 are accrual statutes; therefore, the date Millers' cause of action became ripe will determine which statute applies here. Both statutes begin to run when a complete cause of action has accrued or when a person becomes liable to an action. *Babson Bros. Co. v. Tipstar,* (1983) Ind.App., 446 N.E.2d 11. A cause of action accrues when an injury, wrongfully inflicted, causes damage. *Scates v. State,* (1978) 178 Ind.App. 624, 383 N.E.2d 491. It is not necessary that the extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred. *Shideler, supra.* Failure to discover a right to bring suit does not operate to suspend the statute of limitations. *Fidelity and Casualty Company of New York v. Jasper Furniture Company,* (1917) 186 Ind. 566, 117 N.E. 258; *French v. Hickman Moving & Storage,* (1980) Ind.App., 400 N.E.2d 1384. Likewise, no new cause of action will accrue when consequential damages arise from a prior injury and damage too slight to be noticed when inflicted. *City of North Vernon v. Voegler,* (1885) 103 Ind. 314, 2 N.E. 821; *Schmidt v. Merchants Despatch Transp. Co.,* (1936) 270 N.Y. 287, 200 N.E. 824.

▪ To determine when Millers' cause of action accrued, we must identify the injury and the resultant damages. The "injury" is the wrongful act which caused the loss. The "damages" are the recompense covering the loss; the scale or measure of recovery. *City of North Vernon, supra.* In

the present case, the injury occurred when Monsanto's cumar, which contained PCBs, was applied to the inside of Millers' silo in 1970. When the resulting damage became ascertainable depends on facts not found in the record. When there is a factual issue concerning the date on which a cause of action accrues, and a statute of limitations begins to run, the question is generally one for the fact finder. *Babson Bros. supra.* However, in the interest of judicial economy, and because the exact accrual date is not crucial to our final determination, we will discuss each of the possibilities.

We do not agree with Monsanto that Millers' cause of action accrued upon application of the cumar to the silo. At the time Millers' silo was coated with the toxic cumar, the full impact of PCBs on humans was not known. There were no restrictions on their use, and no damages could have been ascertained. In any event, no damage could possibly occur until the contaminated silage was fed to Millers' herd. *Cf., Gahimer v. Virginia-Carolina Chemical Corporation,* (7th Cir.1957) 241 F.2d 836. Nor do we concur with the trial court and Millers, that the cause of action accrued when Millers discovered the herd's raw milk contained PCBs. *See French, supra.*

Because of a recent surge of litigation in the area, and the unicity of this case, some recitation of the historical and constitutional background of the regulation of PCBs is warranted. Until the mid-1960's, PCBs in the environment had been mistaken for pesticide residues. *See,* Comment, *Federal Toxics Control: The Patchwork Attack on PCBs,* 6 Envir.L.Rep. (Envir.Law Inst.) 10056, 10056 & nn. 1 & 2 (1976). PCBs, which are resistant to flame, heat, and electrical current, had been widely used for industrial purposes. Upon discovery of their adverse effects on wildlife and man, measures were instituted to reduce human exposure to PCBs. Beginning in 1973, the existence of PCBs in animal feed, food packaging materials and food was restrict-

ed by the Federal Food and Drug Administration (FDA).[1] *See* 38 Fed.Reg. 18096. Effective September 4, 1973, temporary tolerance levels of PCBs in products were established allowing for the gradual replacement of PCBs with a non-toxic substance in industries linked to human consumption. However, the FDA did not provide an adjustment period for the elimination of PCBs in silo coatings, stating:

" . . . The use of PCB-containing coatings on the inner walls of silos has resulted in the contamination of silage which has in turn caused PCB residues in the milk of dairy cows consuming the contaminated silage. Since PCB's are toxic chemicals, the PCB contamination of food as a result of these and other incidents represent a hazard to public health. It is therefore necessary to place certain restrictions on the industrial uses of PCB's in the production, handling, and storage of animal feed.

The following special provisions are necessary to preclude accidental PCB contamination of animal feed:

(1) Coatings or paints for use on the contact surfaces of feed storage areas may not contain PCB's or any other harmful or deleterious substances likely to contaminate feed. . . . "

21 C.F.R. Sec. 500.45 (1983)

■■ The Department of Health, Education and Welfare enacted 21 CFR Sec. 500.45 pursuant to the Federal Food, Drug and Cosmetic Act (Federal Act), 21 U.S. C.A., Sec. 301 et seq. (1972). The Federal Act rests upon the constitutional power of Congress to regulate interstate commerce. Congress may also regulate purely intrastate matters when necessary to attain appropriate control over interstate matters, *United States v. Freeman,* (N.D.Ill.1967) 275 F.Supp. 803; *Pevely Dairy Co. v. United States,* (8th Cir.1949) 178 F.2d 363, without a specific requirement that individual transactions be involved in interstate activity. Congress may regulate local activity,

---

1. Action has also been taken at the state and federal level to reduce the harmful effects of PCBs in the environment through regulation of

their manufacture, distribution, use, and disposal. *See,* Ind.Code 13–7–16.5–1 et seq.; 40 C.F.R., Sec. 761 et seq. (1982).

whether big or small, if the immediate situation is representative of many others throughout the country, the total incidence of which, if left unchecked, may have a widespread deleterious effect on commerce. *NLRB v. Jones & Laughlin Steel Corp.,* (1937) 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; *United States v. Andrews,* (D.Mass.1939) 26 F.Supp. 123. In *United States v. Adler's Creamery,* (2nd Cir.1939) 107 F.2d 987, a federal regulation governing the handling of milk was held to cover milk which was produced and sold wholly intrastate. The test is not the location of any one transaction, but the overall purpose of the regulatory scheme which the government seeks to enforce. *United States v. Cassaro, Inc.,* (1st Cir.1971) 443 F.2d 153.

The quaesitum of the Federal Act is to protect the public health by keeping adulterated and harmful articles out of interstate commerce. *United States v. 44 Cases, etc. Viviano Spaghetti With Cheese,* (E.D.Ill.1951) 101 F.Supp. 658. "All articles, compound or single, not intended for consumption by the producer, are regarded as designed for sale, and because they are, it is a concern of the law to have them pure." *United States v. H.B. Gregory Co.,* (7th Cir.1974) 502 F.2d 700, 704, citing *Hipolite Egg Company v. United States,* (1911) 220 U.S. 45, 54, 31 S.Ct. 364, 366, 55 L.Ed. 364. The Federal Act applies to raw materials shipped for use in a final product. *Cassaro, supra.* It also controls intrastate sales made with the knowledge that the purchaser intends to introduce the product into interstate commerce. *Drown v. United States,* (9th Cir.1952) 198 F.2d 999.

In determining the particular scope of 21 C.F.R. Sec. 500.45, we note that 38 Fed.Reg. 18096 labeled silos coated with PCBs as an "avoidable source of contamination." Most dairy farmers do not fully process and market their own products. Rather, they sell the raw milk to a producer, who in turn sells finished dairy products to a retailer or markets them himself. Dairy businesses frequently operate on a wholly local basis. If local dairies across the nation market PCB-contaminated milk, there will undoubtedly be a detrimental effect on interstate commerce. To eliminate the contamination of dairy goods caused by the ingestion of silage stored in PCB-coated silos, 21 C.F.R. Sec. 500.45 must apply to any dairy farmer who sells milk produced by his herd, whether it is sold in its raw state or as a finished product.

Under 21 C.F.R. Sec. 500.45, no silo used for storing feed for dairy cows was allowed to contain a coating of PCBs after September 4, 1973. Following *Hipolite Egg Company, supra,* if milk from Millers' herd is not wholly consumed by its producers, it is regarded as designed for sale and must conform to federal regulations on PCBs. If so, on September 4, 1973, the injury became irremediable and Millers' damages were ascertainable. *See Shideler, supra.* Millers' right to sue Monsanto for the loss of the silo became ripe when the federal regulation took effect. Indiana product liability law was not in effect at that time, therefore, the six-year statute of limitations applicable to injuries to real property would govern the suit. Millers' action, which commenced on July 28, 1982, would be barred.

If, perchance, Millers' dairy business is not affected by 21 C.F.R. Sec. 500.45 for lack of a nexus with interstate commerce, accrual of their cause of action against Monsanto would be on a different date.

The Uniform Indiana Food, Drug, and Cosmetic Act (State Act) is modeled after the Federal Act and deals with intrastate commerce. It was enacted to promote the uniformity of laws safeguarding the public health. Ind.Code 16–1–28–2. Consonant with this purpose, the State Board of Health is authorized to adopt regulations promulgated under the Federal Act. Ind. Code 16–1–28–8. The Indiana Board of Health (Board) has not adopted the federal ban on PCB-contaminated silos. However, the Board did follow the federal standards on testing for PCBs in milk produced by Indiana dairy cows. When the federal regulation of PCBs in dairy products began in 1973, the Board adopted the temporary tolerance levels established in 38 Fed.Reg. 18101 (1972). A temporary tolerance level

of 2.5 ppm in milk was allowed until 1979. *See* 44 Fed.Reg. 38340 (1979). Effective August 28, 1979, the tolerance level was lowered to 1.5 ppm, where it remains today. 21 C.F.R. Sec. 109.30 (1983). Milk which contained unacceptable levels of PCBs was ordered removed from commercial markets by the dairy division of the Board.[2]

Under Indiana law, the presence of PCBs in a feed storage area would not give rise to a right of action until the PCBs produced a prohibited contaminating effect. Nor would an insignificant amount of PCBs in milk create a cause of action. Millers' cause of action did not accrue until the level of PCBs in the herd's milk first reached an impermissible level, whether in violation of the temporary tolerance level, or the present one. Although their suit is predicated upon the loss of the silo, no damages were ascertainable until Millers' dairy products became unsaleable. *Cf. The Board of Commissions of Wabash County v. Pearson,* (1889) 120 Ind. 426, 22 N.E. 134. Prior to that, continued use of the PCB-coated silo was appropriate, particularly in light of Bloomfield Silo Co.'s attempts to assuage its toxic effect by twice recoating the silo, for the amount of PCBs in the herd's milk might never have exceeded the tolerable level.

When the level of PCBs in Millers' cows' raw milk caused it to be unacceptable for marketing is not ascertainable from the record. One particular date need not be established at this point. Millers' cause of action against Monsanto could not have accrued before September 4, 1973, when the temporary tolerance levels went into effect. If the amount of PCBs in the herd's milk surpassed 2.5 ppm before June of 1978, the six-year statute of limitations governing injuries to real property would apply. Unless accrual occurred between July 28, 1976 and June 1, 1978, Millers' cause of action is barred by Ind.Code 34–1–2–1.

If the level of PCBs first exceeded 2.5 ppm after June 1, 1978, or 1.5 after August 28, 1979, Indiana's product liability law would be controlling. Millers' suit cannot meet the ten and two year requirements of Ind.Code 33–1–1.5–5, because the complaint against Monsanto was not filed within ten years of the application of cumar to the silo, which occurred in 1970.

In summary, as of September, 1973, PCBs became a federally regulated commodity. Remedial action was taken to control environmental sources, while preventive measures were established to avoid unnecessary contamination of products eventually meant for human consumption. Ignorance of the federal and state PCB regulations enacted cannot excuse noncompliance. As with all laws enacted for the public health and welfare, knowledge of the PCB regulations must be imputed to all who are affected by them.

 Upon the effective date of 21 CFR 500.45, it was incumbent upon all commercial dairy farmers to discontinue the use of any PCB-coated silo. If another party was liable for the contamination of the silo, the dairy farmer acquired a cause of action for the lost value of the silo. If the dairy farmer continued to use the silo without sanction, his right to bring suit nonetheless arose with the enactment of the prohibition. Disregard of a regulation, whether intentional or inadvertent, will not toll the running of a statute of limitation once a complete cause of action has accrued.

The same can be said for other limitations put on the use and distribution of PCBs. A dairy farmer dealing in a commercial market is bound to keep abreast of new developments and restrictions affecting his business. Harm to the public health through accidental marketing of milk products containing high levels of PCBs is no less injurious than if done by design.

 When a complaint shows on its face that it has been filed subsequent to the

---

**2.** Ind.Code 16–1–28–36.5 was enacted in 1977 to indemnify livestock and poultry producers whose products were condemned due to unavoidable PCB contamination. However, Millers would not have been protected by this provision, which excludes contamination resulting from the continuous use of a known contaminated feed supply.

running of the applicable statute of limitations, dismissal under Ind.Rules of Procedure, Trial Rule 12(B)(6) is appropriate. *DeHart v. Anderson,* (1978) 178 Ind.App. 581, 383 N.E.2d 431. In the instant case, a factual issue arises as to when Millers' cause of action accrued, which question cannot be determined from the face of the complaint. Thus, it does not appear beyond a doubt that Millers are not entitled to relief under any set of facts, and the trial court's denial of Monsanto's motion to dismiss was proper. *See, Citizens National Bank of Grant County v. First National Bank in Marion,* (1975) 165 Ind.App. 116, 331 N.E.2d 471. The date on which the cause of action accrued, and the applicable statute of limitations commenced to run, is a matter for the trier of fact. *Babson Bros., supra.* We note, however, that the statute commences to run upon the accrual of Millers' cause of action, not its discovery. The decision of the trial court is affirmed, and this cause remanded for further proceedings not inconsistent with this opinion.

Judgment affirmed and remanded for further proceedings.

ROBERTSON, P.J., concurs.

RATLIFF, J., concurs in result.